**FILED**

January 7, 2025

~~Fifteenth Court of Appeals~~
~~Christopher A. Prine~~
**Clerk of Court**

RECEIVED IN
15th COURT OF APPEALS

1/7/2025 9:28:32 AM
CHRISTOPHER A. PRINE
Clerk

No. 15-24-00120-CV

# In the Court of Appeals
## for the Fifteenth Judicial District
## Austin, Texas

———

THE STATE OF TEXAS,

*Appellant*,

*v.*

AUSTIN, TEXAS

HARRIS COUNTY, TEXAS; HARRIS COUNTY COMMISSIONERS COURT; LINA HIDALGO, IN HER OFFICIAL CAPACITY AS HARRIS COUNTY JUDGE; RODNEY ELLIS, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 1; ADRIAN GARCIA, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 2; TOM RAMSEY, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 3; LESLEY BRIONES, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 4; HARRIS COUNTY PUBLIC HEALTH; AND LEAH BARTON, IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF HARRIS COUNTY PUBLIC HEALTH,

———

*Appellees.*

On Appeal from the
165th Judicial District Court, Harris County

———

## BRIEF FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant
    Attorney General

JAMES LLOYD
Deputy Attorney General
    for Civil Litigation

KIMBERLY GDULA
Chief

WILLIAM WASSDORF
Deputy Chief

/s/ William H. Farrell
WILLIAM H. FARRELL
Assistant Attorney General
State Bar No. 00796531
biff.farrell@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548 (MC-019)
Austin, Texas 78711-2548
Tel.: (512) 936-2650
Fax: (512) 320-0667

Counsel for Appellant

**ORAL ARGUMENT REQUESTED**

## Identity of Parties and Counsel

**Appellant:**
The State of Texas

**Appellate and Trial Counsel for Appellant:**
Ken Paxton
Brent Webster
James Lloyd
Kimberly Gdula
William D. Wassdorf
William H. Farrell (lead counsel)
Office of the Attorney General
P.O. Box 12548 (MC-019)
Austin, Texas 78711-2548
biff.farrell@oag.texas.gov
(512)-936-2650

**Appellees:**
Harris County
Harris County Commissioners Court
Lina Hidalgo, in her official capacity as Harris County Judge
Rodney Ellis, in his official capacity as Commissioner of Harris County Precinct 1
Adrian Garcia, in his official capacity as Commissioner of Harris County Precinct 2
Tom Ramsey, in his official capacity as Commissioner of Harris County Precinct 3
Lesley Briones, in her official Capacity as Commissioner of Harris County Precinct 4
Harris County Public Health
Leah Barton, in her official capacity as Executive Director of Harris County Public Health

**Appellate and Trial Counsel for Appellees:**
Christian D. Menefee
Jonathan G.C. Fombonne (lead counsel)
Tiffany S. Bingham
Christopher Garza
Elanor Matheson
Ryan Cooper
Edward Swidriski

Office of the Harris County Attorney
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
jonathan.fombonne@harriscountytx.gov
(713)-755-8924

Grant B. Martinez
Lily Hann
Marisa Mata
Yetter Coleman LLP
811 Main Street, Suite 4100
gmartinez@yettercoleman.com
(713)-632-8000

# TABLE OF CONTENTS

**Page(s)**

Identity of Parties and Counsel ................................................................ iii-iv

Index of Authorities ................................................................................ vii

Record References .................................................................................. xiii

Statement of the Case ........................................................................ xiii-xiv

Statement Regarding Oral Argument ...................................................... 1

Issues Presented ...................................................................................... 1

Introduction............................................................................................. 1

Statement of Facts ................................................................................... 4

    I.   Welfare and the Texas Constitution .............................................. 4

    II.  The Harris County Community Prosperity Program .............................. 10

    III. This Litigation ............................................................................ 13

Summary of the Argument...................................................................... 14

Standard of Review ................................................................................ 16

Argument................................................................................................ 17

    I.   The State Has a Cause of Action to Hold Counties Accountable for Exceeding Their Authority Under State Law............................................. 17

    II.  The State Has Standing ............................................................... 20

    III. The County Entities are Not Immune from Suit.................................... 23

    IV. The Texas Attorney General Has Authority to Represent the State of Texas in Civil Litigation.............................................................. 24

    V.  The Program Violates the State Constitution in Two Independent Ways ...................................................................... 30

        A. The Program Violates the Gift Clauses ................................... 32

           1. The Program is entirely gratuitous....................................... 33

           2. The Program does not serve a public purpose......................... 36

           3. Harris County does not retain constitutionally sufficient control over the funds.............................................................. 40

           4. No other constitutional provision authorizes the Program ......... 46

        B.  The Program violates the Texas Equal Protection Clause.............. 53

VI. The State Has Established Irreparable Harm……………………………. 56

    A. The State is harmed in its capacity as a sovereign..………………….. 56

    B. The interest in preserving the status quo, balance of equities,
      and public interest favor the State…………………………………… 58

Prayer………………………………………………………………………59

Certificate of Compliance…………………………………………………..60

Appendix ................................................................................................ 61

# INDEX OF AUTHORITIES

**Page(s)**

**Cases:**

*13335 Duluth Rest. & Bar, L.L.C. v. Hegar,*
No. 14-20-00098-CV 2021 WL 4314468 (Tex. App.—Houston [14th Dist.] Sept. 23, 2021, no pet.)...................................................................... 31

*Abbott v. Harris County,*
672 S.W.3d 1 (Tex. 2023)...................................................... 17

*Abbott v. Perez,*
585 U.S. 579 (2018)...................................................... 20, 57

*In re Abbott,*
No. 21-0720 (Tex. Aug. 26, 2021)...................................... 58, 59

*Avery v. Midland County,*
406 S.W.2d 422 (Tex. 1966) ...................................................... 17

*Bexar County v. Linden,*
220 S.W. 761 (Tex. 1920)..............................................*passim*

*Borgelt v. Austin Firefighters Ass'n, IAFF Local 975,*
692 S.W.3d 288 (Tex. 2024)............................... 14, 33-34, 36, 42

*Butnaru v. Ford Motor Co.,*
84 S.W.3d 198 (Tex. 2002) ...................................... 16, 56, 59

*Byrd v. City of Dallas,*
6 S.W.2d 738 (Tex. [Comm'n Op.] 1928) ............................ 40, 49

*Canales v. Laughlin,*
214 S.W.2d 451 (Tex. 1948) ...................................................... 18

*Cherokee County v. Odom,*
15 S.W.2d 538 (Tex. 1929) ...................................................... 33

*Childress County v. State,*
92 S.W.2d 1011 (Tex. 1936).................................................... 52

*City of Brookside Village. v. Comeau,*
633 S.W.2d 790 (Tex. 1982) .................................................... 53

*City of El Paso v. Heinrich,*
284 S.W.3d 366 (Tex. 2009) .................................................... 57

*City of Elsa v. M.A.L.,*
226 S.W.3d 390 (Tex. 2007) (per curiam)...............................24

*City of Beaumont v. Bouillion*,
   896 S.W.2d 143 (Tex. 1995)……………...……………………………… 24

*City of San Antonio v. City of Boerne*,
   111 S.W.3d 22 (Tex. 2003) ……………………………………………… 17

*Clint Indep. Sch. Dist. v. Marquez*,
   487 S.W.3d 538 (Tex. 2016)……………………………………………… 59

*Crawford Chevrolet, Inc. v. McLarty*,
   519 S.W.2d 656 (Tex. App.—Amarillo 1975, no writ) …………………… 53

*Davis v. City of Lubbock*,
   326 S.W.2d 699 (Tex. 1959)……………………………………………… 36

*Davis v. City of Taylor*,
   67 S.W.2d 1033 (Tex. 1934) …………………………………………… 39

*EBS Solutions, Inc. v. Hegar*,
   601 S.W.3d 744 (Tex. 2020) ……………………………...……………… 16

*Fort Worth Indep. Sch. Dist. v. City of Fort Worth*,
   22 S.W.3d 831 (Tex. 2000) ……………………………………………… 33

*Greene v. Farmers Ins. Exch.*,
   446 S.W.3d 761 (Tex. 2014)……………………………………………..32

*Harris County v. Annab*,
   547 S.W.3d 609 (Tex. 2018) …………………...……………...………… 16

*Hamilton Cnty. Bd. of Cmm'rs v. Mighels*,
   7 Ohio St. 109 (1857)…………………………………………………52

*Harris County v. Gordon*,
   616 S.W.2d 167 (Tex. 1981)……………………………………………… 16

*Hogan v. S. Methodist Univ.*,
   No. 23-0565, 2024 WL 1819826 (Tex. Apr. 26, 2024)……………………50

*Hsin-Chi-Su v. Vantage Drilling Co.*,
   474 S.W.3d 284 (Tex. App.—Houston [14th Dist.] 2015, pet.
   denied)…………………………………………………………………… 19

*In re Eagleridge Operating, LLC*,
   642 S.W.3d 518 (Tex. 2022)………………………………………...…… 31

*In re Gamble*,
   71 S.W.3d 313 (Tex. 2002) ……………………………………………58

*In re Geomet Recycling LLC*,
   578 S.W.3d 82 (Tex. 2019)……………………………………………… 16

viii

*In re State*,
2024 WL 2983176 (Tex. June 14, 2024) .......................................*passim*

*Inman v. R.R. Comm'n*,
478 S.W.2d 124 (Tex. App.—Austin 1972, writ ref'd n.r.e.) ............................ 53

*Janus Films, Inc. v. City of Fort Worth*,
358 S.W.2d 589 (1962) ...................................................................... 59

*Key v. Cmm'rs Ct. of Marion Cnty.*,
727 S.W.2d 667 (Tex. App.—Texarkana 1987, no writ) .................................. 34

*Li v. Pemberton Park Cmty. Ass'n*,
631 S.W.3d 701 (Tex. 2021)……………………………………………………….. 32

*Maryland v. King*,
567 U.S. 1301 (2012) .......................................................................... 58

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise,*
*Inc.*, 501 U.S. 252 (1991) ................................................................... 58

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977) .......................................................................... 58

*New York v. United States*,
505 U.S. 144 (1992) ............................................................................ 57

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................ 58

*Patel v. Tex. Dep't of Licensing Regul.*,
469 S.W.3d 69 (Tex. 2015) ................................................................... 18

*Printz v. United States*,
521 U.S. 898 (1997) ............................................................................ 56

*Quincy Lee Co. v. Lodal & Bain Eng'rs, Inc.*,
602 S.W.2d 262 (Tex. 1980) ................................................................. 17

*Spence v. Fenchler*,
180 S.W. 597 (Tex. 1915) .................................................................... 48

*Spradlin v. Jim Walter Homes, Inc.*,
34 S.W.3d 578 (Tex. 2000)……………………………………………………..39

*State v. Hollins*,
620 S.W.3d 400 (Tex. 2020)......................................................*passim*

*State v. Naylor*,
466 S.W.3d 783 (Tex. 2015) ...........................................................3, 21, 56

*Tex. Ass'n of Bus. v. City of Austin*,
565 S.W.3d 425 (Tex. App.—Austin 2018, pet. denied) ............................. 4, 57

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.*,
852 S.W.2d 440 (Tex. 1993)…………………………………………………… 17

*Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp.
Comm'n*,
74 S.W.3d 377 (Tex. 2002) ....................................................................*passim*

*Texas v. Brooks-LaSure*,
680 F. Supp. 3d 791 (E.D. Tex. 2023) ........................................................48

*Texas v. EEOC*,
933 F.3d 433 (5th Cir. 2019) ....................................................................57

*True the Vote v. Hosemann*,
43 F. Supp. 3d 693 (S.D. Miss. 2014) ........................................................58

*Valentine v. Collier*,
956 F.3d 797 (5th Cir. 2020) ....................................................................57

*Veasey v. Abbott*,
870 F.3d 387 (5th Cir. 2017) ....................................................................58

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992) .................................................................... 16

*Wasson Ints., Ltd. v. City of Jacksonville*,
489 S.W.3d 427 (Tex. 2016)................................................................17, 27

*Whitworth v. Bynum*,
699 S.W.2d 194 (Tex. 1985) ....................................................................53

*Yett v. Cook*,
281 S.W. 837 (Tex. 1926).................................................................3, 21, 58

**Constitutional Provisions, Statutes and Rules:**

42 U.S.C. § 803(b)(7) ..............................................................................10

1869 Const. art. XVI, § 8............................................................................ 6, 7

Tex. Const. art. I, § 3 ................................................................. 2, 14, 53, 55

Tex. Const. art. III
§ 50........................................................................................................7
§ 51 ................................................................................................*passim*
§ 51-a ............................................................................... 9, 32, 45-47
§ 51-a(a)...................................................................................8, 9, 39, 47
§ 51-a(a)-(d)................................................................................................8
§ 51-a(b) ...................................................................................... 9, 47

§ 51-a(c) ............................................................................ 9, 48, 49

§ 52 ..............................................................................................7

§ 52-a ................................................................................ 32, 48-50

§ 52(a) ................................................................................*passim*

Tex. Const. art. VII, § 1 ...............................................................34

Tex. Const. art. IX, § 1 ................................................................ 17

Tex. Const. art. XI

§ 1 .............................................................................................. 17

§ 14 ..............................................................................................7

Tex. Const. art. XVI, § 6(a) ..................................................... 7, 33

Tex. Gov't Code § 45.201.............................................…………29

Tex. Loc. Gov't Code § 81.027 ...................................................37

Tex. R. Civ. P. 683 ............................................................... 19, 23

**Other Authorities:**

Alexander Volokh, *The New Private-Regulation Skepticism: Due Process, Non-delegation and Antitrust Challenges*, 37 Harv. J. L. & Pub. Pol'y 931 (2014) ...............................................................................54

Alison Mitchell, et al., Cong. Rsch. Serv., R43357, Medicaid: An Overview 12 (2023)....................................................................34

Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26786 (May 17, 2021).......................................................54

George D. Braden et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 2 (1977) ..................7-9, 25, 46, 49

Letter from Judge Lina Hidalgo to Commissioners Court, at 1 (Mar. 26, 2021), https://tinyurl.com/HarrisARPA; .......................... 10

McQuillin on Municipal Corporations (2d ed.) vol. 6, p. 292,  2532)....................39

*Primary,* Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/primary (last visited December 29, 2024) ........................................................................... 29

Queen Elizabeth I, Martha Doty Freeman, *Indigent Care in Texas: A Study of Poor Farms and Outdoor Relief*, Index of Tex. Archaeology 18 (2008) ........................................................................................4

*Rockingham County Overseers of the Poor 1787-1862* (tr. Prepared by Kayla M. Heslin), https://tinyurl.com/RockinghamOverseers (last visited December 20, 2024) ...............................................4-5

Rodney Ellis (@RodneyEllis), X (April 23, 2024, 1:39 PM),
https://x.com/RodneyEllis/status/1782841748512817292 .............................. 21

*School Choice*, Houston ISD, https://tinyurl.com/bdhu675x
(last visited December 20, 2024) ................................................................... 55

T.R. Fehrenbach, *Lone Star: A History of Texas and the Texans*
281 (1968) ..................................................................................................... 5, 7

Tex. Att'y Gen. Op. No.:
GM-2578 (1940) ............................................................................................. 46
JM-1255 (1990) ............................................................................................. 39
Tex. H.J.R.:
13, 49th Leg., R.S. (1945) ............................................................................... 8
34, 25th Leg., R.S. (1897) ............................................................................... 7

Texas Legislative Council, *Amendments to the Texas Constitution Since
1876* (May 2024), https://tinyurl.com/Constamend1876 ................................. 9

Vivian Elizabeth Smyrl, *Texas Department of Human Services* (Tex.
State Hist. Ass'n, 2020), https://tinyurl.com/5yakvt9v .................................. 8

*Waiver Overview and Background Resources*, HHSC,
https://tinyurl.com/1115WaiverOverview (last visited December
20, 2024) ..................................................................................................... 55

# RECORD REFERENCES

"1.RR" refers to the first of six volumes of the reporter's record of September 27, 2024. Further volumes are numbered in order. There is an additional reporter's record from the hearing on the Motion to Show Authority held November 22, 2024, referred to as simply "RR." "CR" is used for the clerk's record.

# STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the Case*: | The State of Texas brought an *ultra vires* suit against Harris County and certain county officials and entities (collectively, "Defendants" or "the County") to prevent them from giving away public funds in violation of the Gift Clause, Tex. Const. art. III, § 52(a), and the Equal Protection Clause of the Texas Constitution, *id.* art. I, § 3. CR.7. |
| *Trial Court:* | 165th Judicial District Court, Harris County<br>The Honorable Ursula A. Hall |
| *Trial Court Disposition and Course of Proceedings*: | The State sought a temporary restraining order, temporary and permanent injunctive relief, and a declaratory judgment. CR.7. Defendants filed a plea to the jurisdiction and a response. CR.80. The trial court denied the State's application for a temporary injunction, CR.471, and granted the Defendants' plea, CR.473. The State appealed, CR.478, and sought a temporary order to prevent the County from giving away the public funds at issue pending this appeal. After the trial court found a lack of subject matter jurisdiction and entered final judgment, CR.473, Defendants filed a separate Sworn Motion to Show Authority under Rule 12, CR.489, which was granted by the trial court. CR.537. After the trial court issued an Amended Final Judgment, CR.539, the State filed a Rule 27.3 Notice to include the Amended |

Final Judgment in this appeal. In a per curiam opinion, this Court granted the State's request for a temporary order on December 6 prohibiting the disbursement of any funds under the County's program pending appeal.

## Statement Regarding Oral Argument

This case presents what appears to be a question of first impression in this Court on a matter of statewide consequence (although an almost identical issue is pending before the Court in Cause No. 15-24-00061-CV; *State of Texas v. Harris County, et al.*): whether a locality may, consistent with our State's Constitution, run a lottery-based guaranteed-income program. The State respectfully suggests that oral argument would be useful to this Court in its decisional processes. Nevertheless, the State recognizes that the appeal should also be resolved as expeditiously as possible. The State thus defers to the Court as to whether oral argument would be appropriate.

## Issues Presented

Did the trial court abuse its discretion in denying the State's request for a temporary injunction?

Did the trial court err when granting Defendants' Plea to the Jurisdiction and Sworn Motion to Show Authority Under Rule 12?

## Introduction

Public officials may not violate the Texas Constitution—no matter how altruistic or well-intended the purpose. As the Texas Supreme Court unequivocally stated over a century ago, "[n]o feature of the Constitution is more marked [in] its

vigilance for the protection of the public funds and the public credit against misuse" than the Gift Clauses. *Bexar County v. Linden*, 220 S.W. 761, 761 (Tex. 1920). To prevent improper patronage, the Constitution creates "a positive and absolute" ban, *id.* at 762, on most grants of public funds to private individuals, *see, e.g.*, Tex. Const. art. III, § 52(a). And to ensure the equality of rights guaranteed when men "form a social compact," it precludes arbitrariness in the provision of "exclusive separate public emoluments." *Id.* art. I, § 3.

The County seeks to flout these longstanding protections by using money it received for COVID relief to fund a lottery-based, free-money program known as the "Harris County Community Prosperity Program" ("Program"). Specifically, finding itself with roughly $20 million lying around that it must use or lose, the County proposes to send eighteen monthly checks of $500 payments each to approximately 1,850 lucky residents of Harris County chosen at random from a pool of approximately forty-four times that number. Recognizing the inherent problems with calling the Community Prosperity program a "guaranteed income program," 2.RR.26:19-27:2; 2.RR.34:10-44:6, the County attempted to walk back such classification by striking through "Uplift Harris," the name of its original and now-enjoined program, and writing in "basic income program." 5.RR.88. Yet, the County's own documents still refer to Community Prosperity as a "cash program."

2

5.RR.99. And the County still has no way to determine what products the program recipients will purchase with the county funds, making the whole program unconstitutional for the same reasons as the County's first attempt at a cash giveaway. *In re State,* 2024 WL 2983176 (Tex. June 14, 2024).

The trial court abused its discretion when it refused to enjoin this clear violation of the Constitution's safeguards of the public fisc. "As a sovereign entity, the State has an intrinsic right to enforce its own laws." *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (quoting *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015) (alterations omitted)), and an interest "in the maintenance and operation of its municipal corporations in accordance with th[at] law," *id.* (quoting *Yett v. Cook*, 281 S.W. 837, 842 (Tex. 1926)). Those interests will be irreparably harmed without a temporary injunction because the amount and timing of these gratuitous payments have no specific correlation to a public purpose. And once disbursed, such funds can never be recovered.

The trial court further erred when it granted Defendants' Plea to the Jurisdiction and Sworn Motion to Show Authority Under Rule 12. The State clearly has standing pursuant to the Supreme Court's recognition that "'*ultra vires* conduct' by local officials 'automatically results in harm to the sovereign as a matter of law.'" *Hollins,* 620 S.W.3d at 410. Further, government officials violating state

3

law "inflicts irreparable harm to the State." *Tex. Ass'n of Bus. v. City of Austin,* 565 S.W3d 425, 441 (Tex.App.—Austin 2018, pet. denied). The State also properly sued the county officials responsible for implementing the program, including the one who signed the contract creating the program.

Finally, the trial court's determination that the Texas Attorney General is without authority to represent the State of Texas in this suit was clearly wrong. The Texas Supreme Court has previously indicated the Attorney General's "primary duties are," among other things, "to *represent the State in civil litigation." Perry v. Del Rio,* 67 S.W.3d 85, 92 (Tex. 2001) (emphasis added).

## STATEMENT OF FACTS

## I. Welfare and the Texas Constitution

Although Anglo-American governments have employed welfare systems to care for their citizens since at least the reign of Queen Elizabeth I, Martha Doty Freeman, *Indigent Care in Texas: A Study of Poor Farms and Outdoor Relief,* Index of Tex. Archaeology 18 (2008), it has always been understood that public generosity may lead to abuse of the public treasury. Guardrails are needed to prevent such abuse. For example, from Elizabeth I through the days of the early American Republic, tax money raised for the care of the poor would be "administered by overseers of the poor," *id.*; *e.g.*, *Rockingham County Overseers of the Poor 1787-1862*

4

(tr. prepared by Kayla M. Heslin), https://tinyurl.com/RockinghamOverseers (last visited December 19, 2024) (transcribing meeting minutes of the overseers of the poor of Rockingham County, Virginia). In Elizabethan times, "children whose parents could not work and other married or unmarried persons who did not have an occupation [were required] to work" unless they were "unable to work." Freeman, *supra*, at 18. Those who refused could be jailed. *Id.* at 19. And in the colonies, "principles of local responsibility, family responsibility, and legal settlement" remained "the basis for poor relief systems." *Id.* In Virginia, for example, overseers required those receiving relief to attend overseers' meetings and would fine recipients if they missed a meeting without a good excuse. *Rockingham County*, *supra*, at 27 (discussing Mr. William Cravens).

These kinds of trends continued when Americans began to settle Texas. In the antebellum period, "Texas was always a nearly moneyless region, living year to year on a credit economy based on the future values of land." T.R. Fehrenbach, *Lone Star: A History of Texas and the Texans* 281 (1968). And the State was "ruined economically" by the Civil War; even over a decade postbellum, it was "disastrously in debt," and "[t]here was political, judicial, and social damage no one could repair" *Id.* at 433. Before Texas's 1876 Constitution, counties responded to these circumstances by providing limited care for their poorest residents. Freeman, *supra*,

at 34. When it was provided, care could fall into one of two buckets: "indoor" or "outdoor" care. *E.g.*, *id.* at 53. Indoor care referred to assistance provided to those living within a facility, *id.* at 5, like a county poor house and farm, for which the 1876 Constitution specifically provided. Outdoor care referred to assistance that was not specifically tied to a person's residence in a facility. Freeman, *supra*, at 5. Outdoor care could take one of two forms: either direct assistance from the county; or indirect assistance from a third party that the county reimbursed for the care provided. *Id.*

Perhaps unsurprisingly, given the shortage of specie, when counties did provide money to those in need, they maintained some level of control and oversight. In at least one case, "the recipient of the funds was required to present his accounts, justifying the expenses of care, to the [commissioners] court." *Id.* at 54. Moreover, Bell County's stipends could be used for "medical attention, lodging, food, clothing, coffins and graves," as well as transportation to the state hospital. *Id.* That Texas's early counties exercised this degree of control suggests that the county commissioners' courts filled the role that the overseers would have traditionally played. *See id.* at 35 (discussing the commissioners courts' role).

The 1869 and 1876 Constitutions made the policy choice to constitutionalize indoor relief: Former article XVI, section 8 of the 1869 Constitution permitted counties to provide "a manual labor poor house and farm, for taking care of,

6

managing, employing and supplying the wants of its indigent and poor inhabitants." That provision survives today. *See* Tex. Const. art. XI, § 14. And, in a response to the political patronage and corruption that ran rampant in the period following the Civil War, *see* Fehrenbach, *supra*, at 418, 421, the 1876 Constitution also included the Gift Clauses. Tex. Const. art. III, §§ 50, 51, 52(a); *id.* art. XI, § 3; *id.* art. XVI, § 6(a); *see* George D. Braden et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 2 (1977) (noting that the 1866, 1869, and 1876 Constitutions "reflected the political temper of the time," with the 1876 Constitution representing a response to Reconstruction); *see also, e.g.*, *id.* at 118 (noting that some aspects of the 1876 Constitution reflect "distrust of the legislature . . . traceable to the Republic and its constitution"). Together, these Clauses generally prohibit "the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever." Tex. Const. art. III, § 51; *see also id.* art. III, § 50; *id.* art. XVI, § 6(a). In particular, article III, section 52 prohibits giving public money "in aid of . . . any individual." *Id.* art. III, § 52(a). That prohibition is generally categorical. *Linden*, 220 S.W. at 762.

But the people of Texas have provided exceptions to that general rule. In 1898, Texans amended article III, section 51 to provide a limited exception for public grants of money to individuals. Tex. H.J.R. 34, 25th Leg., R.S. (1897) (adopted, later

7

removed). Specifically, that amendment allowed the Legislature to grant or authorize giving public money to former Confederate soldiers and their families. *Id.* As the Texas Supreme Court later noted, that exception's "evident purpose is to deny to the Legislature any power to grant or to authorize the grant of public money to *all others, absolutely.*" *Linden*, 220 S.W. at 762 (emphasis added); *see also* Braden, *supra*, at 241 ("Section 51 does not prohibit caring for the aged, the blind, the disabled, and the destitute. Only the handing out of cash is prohibited.").

Modern welfare began in Texas in the 1930s with bodies like "the Child Welfare Division of the Board of Control, which was established in 1931 but not funded until 1935; the Texas Relief Commission, which was in operation from 1933 to 1934; and the Old Age Assistance Commission, which was established in 1936." Vivian Elizabeth Smyrl, *Texas Department of Human Services* (Tex. State Hist. Ass'n, 2020), https://tinyurl.com/5yakvt9v. By the end of the decade, "the legislature established the Department of Public Welfare, incorporating the earlier agencies under a more centralized control." *Id.* And following the public calamity of the Great Depression and just days before the official end of World War II, the People of Texas amended the Constitution to permit the Legislature to provide welfare for certain "needy persons" in Texas. *See* Tex. Const. art. III, § 51-a(a)-(d); Tex. H.J.R. 13, 49th Leg., R.S. (1945) (adopted at election). That provision, like "[m]ost of the

welfare amendments adopted since . . . 1933[, was] tied to the federal system of grants to the states." Braden, *supra* at 241. Earlier "welfare amendments" were "either designed to get aboard the federal system or to stay aboard after the United States made changes that conflicted with the Texas constitutional limitations," but the "[then-]current version of Section 51-a attempt[ed] to end the necessity for constant amendment to meet changing federal regulations." *Id.* Although the Constitution was subsequently amended to "[r]emov[e] the explicit requirement for federal matching *funds*," Texas Legislative Council, *Amendments to the Texas Constitution Since 1876* at 40 (May 2024), https://tinyurl.com/Constamend1876, the categories of those eligible remains closely aligned with federal law. For instance, the Constitution authorizes the Texas Temporary Assistance for Needy Families (TANF) program in article III, section 51-a(a), providing that "[t]he Legislature shall have the power, by General Laws, to provide . . . for assistance grants to needy dependent children and the caretakers of such children." The Constitution further permits welfare "for medical care, rehabilitation and other similar services for needy persons," Tex. Const. art. III, § 51-a(b), and maintains Texas's eligibility for federal matching money for such programs, *id.* art. III, § 51-a(c).

## II. The Harris County Community Prosperity Program

The County finds itself in possession of approximately $20 million, half of which the County received from the federal government in May 2021 and the other half in May 2022. Letter from Judge Lina Hidalgo to Commissioners Court, at 1 (Mar. 26, 2021), https://tinyurl.com/HarrisARPA; *see* 42 U.S.C. § 803(b)(7). Initially, the County intended to give away these funds via a program it called "Uplift Harris." Under that initial plan, the County intended to distribute $500 per month to 1,850 County residents for eighteen months. CR.159.

To be eligible for Uplift Harris, an individual must fall within one of "[t]wo cohorts of applicants":

> Geographic cohort: Eligibility is based on income and geography. Applicant's household income must be below 200% of the federal poverty line (FPL) and reside in one of the ten identified high-poverty zip codes. About 70% of applicants would be chosen from the geographic cohort.

> ACCESS Harris: Active participants of Accessing Coordinated Care and Empowering Self Sufficiency (ACCESS) Harris are qualified to apply through their participation in ACCESS Harris and having a household income below 200% FPL. Those participants can reside anywhere in Harris County. About 30% of applicants would be chosen from the ACCESS cohort.

5.RR.105; CR.87-88. Participants must also agree to have their information collected to determine eligibility and receive payments, 2.RR.31:11-14, and promise to

"remain compliant with the terms and restrictions of the [Program]." 2.RR.35:3-17. Nothing further is required of the participants to receive payments.

Roughly 82,000 people applied for Uplift Harris. CR.88. Of those, Harris County deemed around 30,000 applicants ineligible because "they just did not meet the eligibility criteria." 2.RR.48:1-7. Even then, the number of applicants far exceeded the available funds. The County therefore filtered the eligible applications through a randomized lottery to select those that were invited to participate. 2.RR.11:2-7.

The County announced several putative goals for the program, including reducing unemployment, reducing poverty, and boosting self-sufficiency, and improving general health and educational outcomes. 2.RR.10:11-19. But before Uplift Harris payments were made, the State sued the County because the program violated the Gift Clauses. The Texas Supreme Court granted the State's Rule 52.10 motion and enjoined the operation of Uplift Harris because the County could not control of the use of the funds, thus likely violating the Gift Clause. *In re State*, 2024 WL 2983176, at *4. Specifically, there was "no indication that the County intends to, or even could, meaningfully enforce [its] restrictions or truly monitor the recipients' expenditures." *Id*. That case remains pending before this Court. *State of*

*Texas v. Harris County, Texas, et al.,* No. 15-24-00061 (Tex. App.—Austin [15th Dist.]).

Following the Texas Supreme Court's ruling, the County amended Uplift Harris to create the new program at issue in this case, called the Community Prosperity Program. This new program shares all of the above characteristics of Uplift Harris.

The only material difference is that now products purchased with the County funds must be purchased at a vendor that has an approved Merchant Category Code[1] using a county-provided debit card called the "Give Card." 2.RR.52:20-56:7. Although the County formally disallows recipients to use Program funds to make "[p]urchases from entities that primarily sell alcoholic beverages or tobacco, promote gambling, [or] engage in illicit or non-essential activities," 5.RR.107, the County has acknowledged that it has no way of independently verifying how the money is spent, 2.RR.65:21-68:3. Instead, the County relies on chance and word of mouth to ensure that the funds are not used in a way the Community Prosperity program disallows. 2.RR.83:5-19. While the County can generally see where goods are purchased, 2.RR.55:18-21, Harris County has no way of knowing what was

_____

[1] A Merchant Category Code is a four-digit number used for retail financial services to classify a business by the types of goods or services and are specified by International Organization for Standardization 18245 standard.

actually purchased, 2.RR.55:22-24. In fact, Harris County remains unaware whether the Program's current restrictions may be augmented or drafted differently as "there's still considerable planning that needs to be done." 2.RR.90:7-91:1.

## III. This Litigation

The State sued Defendants on September 19, 2024. CR.7. The trial court held a hearing on the State's application for a temporary injunction, *see generally* 2.RR1, which the trial court denied, CR.471. At the same time, the trial court granted the Defendants' Plea to the Jurisdiction, CR.473. Upon receiving a written, appealable order, the State filed its notice of appeal on October 28, 2024, CR.478, and moved this Court for a temporary order preventing the issuance of Program payments pending appeal.

On November 7, 2024, Defendants filed a Sworn Motion to Show Authority under Rule 12, CR.489, and the trial court held a hearing on same, *see generally* RR, Motion to Show Authority. The trial court granted Defendant's motion and entered an Amended Final Judgment. CR.539. The State then filed a Notice pursuant to Texas Rule of Appellate Procedure 27.3 to include the late-filed ruling in this appeal. Notice, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—Austin [15th Dist.] Nov. 25, 2024). This Court granted the State's motion for a temporary order and enjoined the County from making payments under the Program pending appeal

13

or until further order of this Court. Order, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—Austin [15th Dist.] Dec. 6, 2024).

## SUMMARY OF THE ARGUMENT

**I.** The trial court abused its discretion in denying the temporary injunction. The Program is an unconstitutional exercise of government power for two primary reasons. *First*, the program constitutes an impermissible gift of public funds to private individuals in contravention of article III, section 52(a) of the Texas Constitution. Under the test developed in *Texas Municipal League*, and further clarified in *Borgelt v. Austin Firefighter's Ass'n,* the grant of public funds is not considered gratuitous if (1) the funds bring a public benefit, (2) the predominant objective is to accomplish a legitimate public purpose and not provide a benefit to a private party, and (3) the government retains control over the funds to ensure that the public purpose is in fact accomplished. *Borgelt,* 692 S.W.3d 288, 301 (Tex. 2024). The Program flunks the elements of the *Texas Municipal League* test as the program does not bring a public benefit, have a predominantly public purpose, nor does the County retain sufficient control over the funds. *Second*, the selection process that the County deployed to select who will receive Program funds violates the Texas Equal Protection Clause, Tex. Const. art. I, § 3, because there is no rational connection

14

between the source of the funds, the eligibility criteria, and the program's putative purpose.

**II.** The trial court also erred in granting the Defendants' Plea to the Jurisdiction and Motion to Show Authority. The State has standing pursuant to the Supreme Court's recognition that "'*ultra vires* conduct' by local officials 'automatically results in harm to the sovereign as a matter of law." *Hollins,* 620 S.W.3d at 410. Further, government officials violating state law "inflicts irreparable harm to the State." *City of Austin,* 565 S.W3d at 441. The State also properly sued the county officials responsible for implementing the program, including the one who signed the contract creating the program. And the Texas Attorney General certainly has the authority to represent the State of Texas under the Constitution and long-standing precedent of this State. The Attorney General's "primary duties are," among other things, "to *represent the State in civil litigation." Perry,* 67 S.W.3d at 92.

**III.** The State met its burden to establish irreparable harm. When a local governmental official violates state law, including the Constitution, the State necessarily suffers an irreparable injury. *Hollins*, 620 S.W.3d at 410. That injury is particularly acute here because the County's payments, if allowed, cannot be undone. And the trial court failed to maintain the status quo when it denied the

15

State's application for a temporary injunction; this only exacerbates the State's injury.

## STANDARD OF REVIEW

"To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to relief sought; and (3) a probable, imminent and irreparable injury in the interim." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). This Court reviews a trial court's ultimate decision to deny a temporary injunction for abuse of discretion. *Id.*; *see also, e.g.*, *Harris County v. Gordon*, 616 S.W.2d 167, 168 (Tex. 1981). But a trial court "has no 'discretion' in determining what the law is or applying the law to the facts." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). Accordingly, "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Id.*; *see also, e.g.*, *In re Geomet Recycling LLC*, 578 S.W.3d 82, 91-92 (Tex. 2019) (orig. proceeding).

Whether a court can exercise subject-matter jurisdiction over a claim is a question of law that is reviewed de novo. *EBS Solutions, Inc. v. Hegar,* 601 S.W.3d 744, 749 (Tex. 2020); *Harris County v. Annab*, 547 S.W.3d 609, 612 (Tex. 2018). "When reviewing a trial court order dismissing a cause for want of jurisdiction, Texas appellate courts 'construe the pleadings in favor of the plaintiff and look to

the pleader's intent.'" *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

**ARGUMENT**

## I. The State Has a Cause of Action to Hold Counties Accountable for Exceeding Their Authority Under State Law.

To start, the State has a cause of action here for the same reasons it had a cause of action to sue Harris County for exceeding its authority in *Hollins*: As a subdivision of the State of Texas, Harris County has no sovereign power of its own. *Hollins*, 620 S.W.3d at 403-04. It "is a subordinate and derivative branch of state government." *Avery v. Midland County*, 406 S.W.2d 422, 426 (Tex. 1966), *vacated on other grounds*, 390 U.S. 474 (1968); *see* Tex. Const. art. IX, § 1; Tex. Const. art. XI, § 1. As a political subdivision, the County "possess[es] only such powers and privileges" as the State confers upon it. *Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 430 (Tex. 2016); *e.g.*, *Quincy Lee Co. v. Lodal & Bain Eng'rs, Inc.*, 602 S.W.2d 262, 264 (Tex. 1980). The remaining Defendants are agents of Harris County and thus cannot take any action in their official capacities that exceeds the scope of the County's powers. *Cf. Abbott v. Harris County*, 672 S.W.3d 1, 9-12 (Tex. 2023).

Applying these principles, the Texas Supreme Court recognizes that "a commissioners court may exercise only those powers expressly given by either the Texas Constitution or the Legislature." *City of San Antonio v. City of Boerne*, 111

17

S.W.3d 22, 28 (Tex. 2003) (citing *Canales v. Laughlin*, 214 S.W.2d 451, 453 (Tex. 1948)). And the Texas Constitution provides an abundantly clear statement about gifts: "[T]he Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever." Tex. Const. art. III, § 52(a).

Because counties derive their power from the State, and the State has no authority to authorize a "grant [of] public money or thing of value in aid of, or to any individual," *id.*, when counties undertake to do so, the State has a cause of action because County officials have acted *ultra vires. Hollins*, 620 S.W.3d at 405. Nevertheless, the State recognizes that the Texas Supreme Court has distinguished between claims that an officer has exceeded his authority under a constitutional statute and a claim that a statute is unconstitutional. *Patel v. Tex. Dep't of Licensing Regul.*, 469 S.W.3d 69, 76-77 (Tex. 2015). To avoid unnecessary litigation over how best to characterize this complaint, Texas sued *both* the individuals who intend to engage in "unlawful acts" and the entities responsible for enforcing the Community Prosperity Program. *Id.*

In arguing that the State does not have a cause of action, Defendants have suggested that the State cannot assert an *ultra vires* claim against Harris County or

18

the Harris County Commissioners' Court because the State's brief was devoid of argument about individual officials' actions to perform a ministerial act. CR.113. This, however, misunderstands both the ultra vires cause of action and the rules of civil procedure. The ultra vires cause of action applies *either* to "(1) an action without legal authority or (2) failure to perform a purely ministerial act." *Hall v. McRaven*, 508 S.W.3d 232, 241 (Tex. 2017). The State has sought relief against Defendants because Defendants are the ones who are acting without legal authority by violating the Gift Clauses. Further, by operation of law, an injunction—regardless of the court that enters it—is binding "upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Tex. R. Civ. P. 683; *see Hsin-Chi-Su v. Vantage Drilling Co.*, 474 S.W.3d 284, 296 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). Thus, the State has a cause of action against the County and its officials because they have exceeded their authority under state law. *Hollins*, 620 S.W.3d at 410. In fact, while arguing the State does not have a valid *ultra vires* claim against Harris County and/or Harris County Commissioners' Court, Defendants explain "Harris County Commissioners Court voted to approve the Community Prosperity Program" and "direct[ed] Harris

County Public Health to develop [the] program." CR.91. Defendants cannot avoid an injunction by acting through agents.

## II. The State Has Standing.

While the County acknowledges the "Supreme Court has held that the State has standing to bring suit to enforce its owns laws," CR.114, the County contends this standing doctrine should be reexamined. *Id.* The State undeniably has standing to bring this case. Notwithstanding the minor factual differences between Uplift Harris and the new Program, the State's injuries and requested relief remain identical, and the Supreme Court has previously indicated "[t]o the extent the County challenges the State's standing to bring this suit, our recognition in *Hollins* and elsewhere that the State has a justiciable interest in assuring that its political subdivisions comply with Texas law sufficiently establishes the State's standing at this juncture." *In re The State of Texas,* 2024 WL 2983176, at *4 n.4 (Tex. June 14, 2024).

More specifically, the Supreme Court recognized that "'*ultra vires* conduct' by local officials 'automatically results in harm to the sovereign as a matter of law.'" *Hollins,* 620 S.W.3d at 410. Violation of state law by local government officials "clearly inflicts irreparable harm on the State." *City of Austin,* 565 S.W.3d at 441 (quoting *Abbott v. Perez,* 585 U.S. 579, 602 n.17 (2018). And the State has a

20

"justiciable interest" and "intrinsic right . . . to enforce its own laws." *Hollins,* 620 S.W.3d at 410 (first quoting *Yett,* 281 S.W. at 842; and then quoting *Naylor,* 466 S.W.3d at 790).

The County has also argued that the State lacks standing to sue the individually named Defendants because it has failed to establish traceability to those Defendants. These assertions are hard to square with the fact that Defendants did *not* disburse Uplift Harris funds after the Supreme Court stayed them from making program payments. *In re State*, 2024 WL 2983176, at *5. If the State's injury is not traceable to Defendants or redressable by the relief the State has sought, Uplift Harris payments, and presumably Program payments, would have issued irrespective of the stay. *See id.* at *2 ("A stay pending appeal is, of course, a kind of injunction."); *see also* Rodney Ellis (@RodneyEllis), X (April 23, 2024, 1:39 PM), https://x.com/RodneyEllis/sta-tus/1782841748512817292 ("We were racing to get at least one payment out the door, but unfortunately we were not able to process them before the Supreme Court order came down."). In any event, the State has satisfied both the traceability and redressability requirements.

*First*, the State's injury is "fairly . . . trace[able] to the challenged action of the [D]efendant[s], and not . . . th[e] result [of] the independent action of some third party not before the [C]ourt." *Heckman v. Williamson County*, 369 S.W.3d 137, 154

21

(Tex. 2012) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In particular, the record in Uplift Harris reflects that Defendant Hidalgo signed the Uplift Harris contract with GiveDirectly, the entity that "administer[s] the Program by working with [the] County." Reply Br. for Appellant, *State v. Harris County*, No. 15-24-00061-CV (Tex. App.—Austin [15th Dist.] Aug. 12, 2024) (citing the record in the Uplift Harris appeal). She also signed the amendment to the contract to instigate the Program. 5.RR.95. She, at least, is thus responsible for the County's prospective conduct. The contract also reveals that Harris County is "acting by and through" HCPH. 5.RR.92.

Moreover, the record reflects that HCPH—and, thus, its Executive Director—played a key role in revamping Uplift Harris to turn it into the new Program. After the Supreme Court issued the emergency stay relating to Uplift Harris, "[HCPH] started talking about, Okay. If this program doesn't continue, is there another program that – [HCPH] can implement that will have the same goals and the same – meet the same people, right, to fulfill the same purpose of Uplift Harris." 2.RR.9:14-24. In answer to that question, HCPH created "a new program called Community Prosperity."2.RR.19:9-12. As a director with HCPH, Mr. Maddox explained "part of [his] duties [was] to put items on the commissioner's court agenda." 2.RR.14:11-15. On August 27, 2024, HCPH placed the Program on

22

the Commissioners Court agenda requesting "court action to actually amend the agreement with GiveDirectly to launch the Community Prosperity Program," 2.RR.25:8-10, which was "voted on and approved by [the] commissioner's court." 2.RR.32:1-4, Response, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—Austin [15th Dist.] Nov. 21, 2024, App'x Tab 7). If nothing else, then, the County's action is directly traceable to defendants Hidalgo and Barton.

*Second*, the relief the State has sought would redress its injury. *Cf. State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (per curiam) (noting that ultra vires conduct automatically injures the sovereign as a matter of law). As the County has admitted, it controls GiveDirectly because the County "agreed to only provide [five] million [to GiveDirectly] up-front at a time." 2.RR.29:6-7. An order granting an injunction is binding on "parties to the action, their officers, agents, servants, employees, and attorneys, upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Tex. R. Civ. P. 683. Accordingly, an injunction running to the named Defendants would redress the State's harm by preventing the issuance of payments in violation of the Constitution.

## III. The County Entities are Not Immune from Suit.

The County has also argued that because it has not waived governmental immunity, it, the Commissioners Court, and HCPH are not amenable to suit. But

the Supreme Court of Texas has held that "'suits for injunctive relief' may be maintained against governmental entities to remedy violations of the Texas Constitution." *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007) (per curiam) (quoting *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995)). The County entities retain "immunity from suit unless the [Plaintiff has] pleaded a viable claim." *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011). For the reasons discussed below, the State brings a valid claim.

## IV. The Texas Attorney General Has Authority to Represent the State of Texas in Civil Litigation.

The County argues the Attorney General lacks authority to represent the State in district courts in Harris County. CR.116-17. The County further argues that representation of the State in Harris County courts is the county attorney's job. CR.117. The County is wrong on both counts.

The Supreme Court recently explained, "[t]he Texas Constitution authorizes the attorney general, county attorneys, and district attorneys to represent the state in various cases." *State ex rel. Durden v. Shahan,* 658 S.W.3d 300, 303 (Tex. 2022). This authority to "represent the [S]tate," the Court explained, "does not necessarily include the authority to independently decide whether to *institute* a suit on the [S]tate's behalf." *Id.* Unless the Constitution conveys the authority directly, "[t]he Legislature must provide that authority by statute." *Id.* (citing, *inter alia,* Tex.

Att'y Gen. Op. No. GA-507 (2007) (examining both constitutional and statutory grants of authority)). The Attorney General has general authority to pursue civil claims on behalf of the State; county attorneys do not.

"The office of attorney general is older than the United States and older than," the State of Texas. *State of Fla. ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266, 268 & n.4 (5th Cir. 1976); *Saldano v. State,* 70 S.W.3d 873, 878-79 (Tex. Crim. App. 2002). With its roots in the "earliest period of English legal history," by the sixteenth century, the Attorney General could be considered "the chief representative of the [sovereign] in the courts." *Shevin,* 523 F.2d at 268 n.4 (quoting VI W. Holdsworth, A History of English Law 457-61 (2d ed. 1971)).

For well over a century, the Attorney General has been representing the State of Texas in its district courts in civil matters. *See* George D. Braden et al., The Constitution of the State of Texas: An Annotated and Comparative Analysis 354 (1977). "[I]t has been steadily held that an action or suit can be maintained by an attorney general in [sic] behalf of the state for the redress of injury to the public, or to prevent this and that he cannot maintain a suit or action when private rights alone are involved." *State v. Farmers' Loan & Trust Co.,* 17 S.W. 60, 65 (Tex. 1891). It is "the duty of the attorney general to institute necessary proceedings in the court to enforce or protect any right of the public that is violated, or to redress or prevent any

injury done to the public that demands the intervention of the courts." *Queen Ins. Co. v. State,* 22 S.W. 1048, 1052 (Tex. Civ. App.), *rev'd on other grounds,* 24 S.W. 397 (1893). "[W]here the public are injured[,] the state *must sue* to redress the wrong by her attorney general, whether there be a statute to that effect or not." *Id.* (emphasis added).

Consistent with this history, the Texas Supreme Court has recognized that the Attorney General's "primary duties are," among other things, "to *represent the State in civil litigation.*" *Perry,* 67 S.W.3d at 92 (first citing Tex. Const. art. IV, §§1, 22; and then citing Tex. Gov't Code § 402.021). Indeed, according to the Court, the Constitution assigns the Attorney General "exclusive" control over representing the State in civil appellate litigation. *E.g., Maud v. Terrell,* 200 S.W. 375, 376 (Tex. 1918) (orig. proceeding). In discharging that duty, the Attorney General has broad discretion over the selection of legal arguments, the assessment of the available facts and evidence, and the ultimate decision about whether to institute suit. *Perry,* 67 S.W.3d at 92, *Agey v. Am. Liberty Pipe Line Co.,* 172 S.W.2d 972, 974-75 (Tex. 1943); *Charles Scribner's Sons v. Marrs,* 262 S.W. 722, 727-28 (Tex. 1924) (orig. proceeding); *Lewright v. Bell,* 63 S.W. 623, 623-24 (Tex. 1901) (orig. proceeding). By

26

contrast, consistent with how it treats all issues relating to county authority,[2] the Court has recognized that county attorneys have *no* power to initiate civil suits on behalf of the State unless a statute expressly says so. *Durden,* 658 S.W.3d at 303.

Here, Harris County, a political subdivision of the State, acting through its officials, is blatantly violating the Texas Constitution by giving away monies to individuals without any authority to do so. "Texas law could not be clearer: The State's chief legal officer—sworn to 'preserve, protect and defend' Texas law—should in fact be permitted to preserve, protect and defend it." *In re State,* 489 S.W.3d 454, 456 (Tex. 2016) (Willett, J., concurring). Courts have also rejected the idea that locally elected county and district attorneys have the exclusive authority to represent the State in all matters before the district courts. *Cf. Brady v. Brooks,* 89 S.W. 1052, 1056 (Tex. 1905) ("Is it reasonable to suppose that it was the purpose to [e]ntrust absolutely the important function of representing the state as an attorney in all cases in which the state should be a party to the numerous county attorneys or to the district attorneys, should the Legislature see fit to create that office for certain districts, elected, as the case may be, in their respective counties or districts, or to a

---

[2] Because counties "represent no sovereignty distinct from the [S]tate," county officers' authority "is limited" no matter the department of government: They "possess only such powers and privileges as have been expressly or impliedly conferred upon them." *Hollins,* 620 S.W.3d at 406 (quoting *Wasson Ints., Ltd. v. City of Jacksonville,* 489 S.W.3d 427, 429-30 (Tex. 2016)).

general state officer, like the Attorney General, elected by the people of the whole state? To ask the question is to answer it.").

Applying these principles, the Court has recently upheld the Attorney General's prosecution of *ultra vires* suits on behalf of the State which seek to bring local authorities into compliance with state law. *In re State,* 2024 WL 2983176, at *4; *Hollins,* 620 S.W.3d at 410. Notably, it has agreed with precedents from the courts of appeals dating back to at least 1922 that generalized statutes like those on which the County relies do *not* authorize county attorneys to enforce state civil laws. *Durden,* 658 S.W.3d at 303 n.1.

The County's novel argument flies in the face of *Hollins*. In that case, the State, acting through the Attorney General, sued the county clerk of Harris County. *Hollins*, 620 S.W.3d at 404-05. Importantly, it brought a common law ultra vires action. *Id*. at 405. The Texas Supreme Court held that the State had a "justiciable interest in its sovereign capacity in the maintenance and operation of its municipal corporations in accordance with law." *Id*. at 410. As "a sovereign entity, the State has an intrinsic right to . . . enforce its own laws." *Id*. Indeed, the "sovereign would be impotent to enforce its own laws if it could not temporarily enjoin those breaking them pending trial." *Id*. That the Attorney General never had the power sue Harris County officials in light of these holdings is nonsensical.

As support for its claim regarding "exclusive" authority to represent the State, the County points to article 5, section 21 of the Texas Constitution which it insists "is the express duty of county attorneys to 'represent the State in all cases in the District and inferior courts in their respective counties.'" CR.115 (quoting Tex. Const. art. V, § 21). Because "[Government Code section 45.201] makes it the exclusive duty of the Harris County Attorney to represent the State in all civil matters pending before the courts of Harris County and any other courts," the County argues that the County Attorney is the proper representative of the state in this action. CR.492-93. But the Supreme Court has already rejected the notion that such general language granting "authority to *represent* the [S]tate . . . necessarily include[s] the authority to independently decide whether to *institute* a suit on the state's behalf." *Durden,* 658 S.W.3d at 303. Consistent with that authority, the Attorney General and *only* the Attorney General has the authority to institute a civil *ultra vires* suit to enforce the Texas Constitution.

Further, though section 45.201 has been law since September 1, 1985, Harris County failed to raise the argument in *State v. Hollins,* 620 S.W.3d 400, 406 (Tex. 2020), or *State v. Harris County,* No. 15-24-00061-CV, currently pending before this Court. That is because Harris County knows that it is wrong. Section 45.201 uses the words "primary duty," not "exclusive," as the County argues. Accepting the

County's argument would necessarily mean the State could never bring *ultra vires* claims against the County for anything—despite Texas courts' clear understanding to the contrary. *Supra* p. 17. "Primary" duty does not, and cannot, mean "exclusive" duty. *Primary,* Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/primary (last visited December 29, 2024).

If the Attorney General cannot represent the State in Harris County, the State would be unable to vindicate its rights if the county attorney was unwilling to do so. After all, "*ultra vires* conduct harms the sovereign as a matter of law." *Hollins,* 620 S.W.3d at 410. But if the County has its way, the sovereign would be unable to seek redress for that injury—or any injury—in Harris County. That simply cannot be right.

## V. The Program Violates the State Constitution in Two Independent Ways.

As the Texas Supreme Court has pointed out, the State has "raised serious doubt about the constitutionality of the Uplift Harris program [] and [its] potential violation of the Texas Constitution." *In re State,* 2024 WL 2983176, at *3. And the County has explained that the Program was designed to meet "the same goals and the same—meet the same people, right, to fulfill the same purpose [as] Uplift Harris." 2.RR.9:14-24. Because Uplift Harris's provisions continue to afflict the

Program, the Program likewise violates the Constitution. The County is therefore misguided when it claims that the Program receives the presumption of constitutionality. *See* Response, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—Austin [15th Dist.] Nov. 21, 2024) at 36.

The Program is ultra vires for two reasons. *First*, it violates the Gift Clauses. *Second,* it transgresses the Constitution's equal-protection guarantee because it allots a public emolument in a way that has no rational connection to either the purpose for which the federal government provided the money (fighting COVID) or Harris County's self-defined class of potential beneficiaries.

The County has tried to place matters of legal sufficiency beyond this Court's review by invoking the "deferen[ce]" supposedly due to the Commissioners Court. *E.g.*, County Response 38. But a government official never has "discretion to violate the law and commits an ultra vires act if he or she acts in conflict with the law." *13335 Duluth Rest. & Bar, L.L.C. v. Hegar*, No. 14-20-00098-CV, 2021 WL 4314468, at *5 (Tex. App.—Houston [14th Dist.] Sept. 23, 2021, no pet.) (mem. op.). "If the Commissioners Court acts illegally, unreasonably, or arbitrarily, a district court may so adjudge." *Commissioners Ct. of Titus Cnty. v. Agan*, 940 S.W.2d 77, 80 (Tex. 1997).

The County is also wrong that the State cannot make "new arguments on appeal about other constitutional provisions." County Response 58. The County

invokes *In re Eagleridge Operating, LLC*, 642 S.W.3d 518, 525 (Tex. 2022) (orig. proceeding), for the proposition that the trial court could not have abused its discretion if the State did not present precisely the same argument below that it now offers to this Court. But *Eagleridge* says that no abuse of discretion occurs when a trial court does not consider "unpleaded and unpresented *issues*." *Id.* (emphasis added). It is black-letter law in Texas that, "while appellate courts 'do not consider *issues* that were not raised ... below,' parties may 'construct new *arguments* in support of issues' that were raised." *E.g.*, *Li v. Pemberton Park Cmty. Ass'n*, 631 S.W.3d 701, 704 (Tex. 2021) (quoting *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014)). And issues are "treated as covering every subsidiary question that is fairly included." Tex. R. App. P. 38.1(f). For example, because the State raised the issue that the Gift Clauses prohibit the Program, all arguments regarding that issue are fair game.

### A. The Program violates the Gift Clauses.

As the Texas Supreme Court has explained, the Gift Clauses "absolute[ly]" and "positive[ly]" prohibit the "giving away of public money" for private purposes. *Linden*, 220 S.W. at 762. The Constitution provides exceptions to that broad and strict general rule. *E.g.*, Tex. Const. art. III, §§ 51-a, 52-a. But the "purpose" of specific exceptions "is to deny" the government "any power to grant or to authorize

32

the grant of public money to all other []" purposes, "absolutely." *Linden*, 220 S.W. at 762. In other words, absent a specific constitutional exception (or satisfying the Gift Clauses themselves), a grant of public resources will not pass Gift Clause muster. That limitation tracks the constitutional text, which prohibits "appropriation[s] for private or individual purposes . . . *unless authorized by th[e] Constitution.*" Tex. Const. art. XVI, § 6(a) (emphasis added). And these limitations apply not just to state action, but also to the actions of local governments like counties, as the Texas Supreme Court has made clear. *See, e.g.*, *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 839, 843 (Tex. 2000) (applying article III, sections 51 and 52(a) in assessing the constitutionality of city ordinances); *Cherokee County v. Odom*, 15 S.W.2d 538, 541 (Tex. 1929) (applying article III, section 50 to a county contract). The Gift Clauses apply here—and the Program does not satisfy them.

The Supreme Court has recently clarified what the Gift Clauses require. "A challenged public expenditure satisfies [section] 52(a)'s Gift Clause when (1) the expenditure is not gratuitous but instead brings a public benefit; (2) the predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party; and (3) the government retains control over the funds to ensure that the public purpose is in fact accomplished." *Borgelt,* 692 S.W.3d at 301. The Program

33

does not satisfy this test. And no other constitutional provision authorizes the Program.

### 1. The Program is entirely gratuitous.

To start, a $500-per-person payout provided just because the County has the funds is entirely gratuitous because "the political subdivision receives [no] return consideration." *Tex. Mun. League*, 74 S.W.3d at 384 (citing *Key v. Cmm'rs Ct. of Marion Cnty.*, 727 S.W.2d 667, 668 (Tex. App.—Texarkana 1987, no writ)).

True, in the Gift Clause context, consideration can take many forms. For example, it could take the form of a "return benefit." *Borgelt*, 692 S.W.3d at 300 n.14 (citing *Tex. Mun. League*, 74 S.W.3d at 384-85). Or it might include meeting otherwise applicable legal requirements. For example, the Texas Constitution requires an "efficient system of public free schools," and providing school vouchers may reduce the costs of funding those schools. Tex. Const. art. VII, § 1. And funding preventative care may satisfy conditions imposed on federal Medicaid funding. *See* Alison Mitchell, et al., Cong. Rsch. Serv., R43357, Medicaid: An Overview 12 (2023).

But Harris County gets nothing for paying Program funds. The Program's own website indicates that the only requirement the Program lays on applicants for the funds is that they reside within ten specified zip codes or are enrolled in ACCESS

34

Harris. https://uplift.harriscounty.tx.gov/FAQs (last visited Dec. 29, 2024). Because fund recipients do not give consideration in exchange for those funds, the funds constitute an unconstitutional gift. *See Tex. Mun. League*, 74 S.W.3d at 383. It is no answer to simply say the program reduces poverty or "may" improve self-sufficiency. "Seeing what happens" is far from a "clear" public benefit. *See id.*

And for many of the reasons already discussed, Harris County doesn't receive a benefit in return for program funds. Recipients' spending the money does not create a return benefit to the County—by, for example, promoting the County's economic development, *see* CR.103—because nothing requires recipients to spend the funds *in Harris County*. 2.RR.68:4-9. Nor does relief to the poor *itself* constitute consideration. While poverty relief is a laudable goal, Program funds recipients do not give anything in return for the funds by merely receiving them.

The County has argued that "detailed information" it receives from recipients "is valuable" and thus constitutes consideration. But the "survey of [recipients'] financial status and spending habits" the County references is optional. County Resp. 48. Irrespective of how "valuable" the County considers it, that information cannot constitute a bargained-for exchange for Uplift Harris payments when recipients may choose whether to participate in the survey. County Resp. 48 (first citing Resp. App. 9 at Ex. B; and then citing Resp. App. 5).

The County has also contended that participants give consideration because they must share "account data directly with GiveDirectly and with the County." County Resp. 48. But that line of argument, like its previous argument that data collected from a "study" constitutes consideration because the study could obtain "no results" without recipients, depends upon the notion that mere participation in a giveaway renders that giveaway constitutional. But if that is so, the Gift Clauses mean nothing. That can't be right.

### 2. The Program does not serve a public purpose.

The Gift Clauses require that a public expenditure's "*predominant* objective" be "to accomplish a legitimate public purpose, not to provide a private benefit." *Borgelt,* 692 S.W.3d at 304 (emphasis added). The adjective "predominant" matters: "[I]t is easy to adorn an otherwise-illegal transfer to a private recipient with a mere bauble of public purpose. Even if such a transfer technically complies with the 'gratuity' requirement, the Gift Clause still forbids a transfer when the public purpose is the caboose rather than the engine." *Id.* And while a legislative decision that a grant serves a public purpose receives "great weight," whether a program serves a public purpose is ultimately a judicial question. *Davis v. City of Lubbock*, 326 S.W.2d 699, 704 (Tex. 1959).

Although Texas law has long recognized the importance of providing for the less fortunate, *e.g.*, Tex. Loc. Gov't Code § 81.027, a cash payout that certain lucky individuals happen to receive does not meet the standard for what serves a public purpose. Even if one accepts that the Program has some tangential and attenuated public benefits, its *primary* purpose is to benefit private individuals. The Program's website indicates that it "aims to promote the self-sufficiency of Harris County residents by enhancing their financial stability." https://uplift.harriscounty.tx.gov/ (last visited Dec. 29, 2024). Had Harris County invested the funds in some form of healthcare or poverty-related infrastructure, that might have "promoted the self-sufficiency of Harris County residents." *Id.* Instead, the County has decided to cut eighteen one-time checks to recipients in limited zip codes, which checks the recipients can spend on essentially whatever they want so long as the merchant has the proper MCC. 5.RR.92; *see infra* p. 41. The State does not dispute that poverty relief is a laudable goal, but merely reciting praiseworthy aims does not change the private purpose that inheres to giving people gifts. And as discussed below, the Texas Constitution specifies how it may be achieved. *Infra* p. 46.

The County has asserted that the Program purposes "to reduce unemployment, reduce poverty, boost self-sufficiency, and improve general health and educational outcomes," 2.RR.10:13-19, but in this Court, it has defended only

37

three purported public aims: recovery from a public calamity, economic development, and assisting the poor. County Resp. 51-52. Those do not predominate.

*First*, the record belies any notion that a desire to recover from a public calamity—here, COVID—is the predominant purpose. *See* Tex. Const. art. III, § 51. *Contra* Resp. 52. As the federal government has declared, COVID is over. *See* H.J. Res 7 (April 14, 2023). Moreover, nothing in the Program or its eligibility criteria links to COVID relief. *See, e.g.*, 4.RR.67 (eligibility criteria). Indeed, if anything, the Program's eligibility criteria speak to poverty relief, not relief from a public calamity.

*Second*, any economic benefits that may derive from the Program are too attenuated for economic development to be the program's driving force. As the Texas Supreme Court put it, "nearly any direct gift of public money that will likely be spent by the recipient could qualify as 'economic development'—on the theory that any boost in overall consumer spending is good for the economy." *In re State*, 2024 WL 2983176, at *4. That result would vitiate the Gift Clauses. S*ee id.*

*Third*, though assisting the poor is surely an admirable goal, it cannot, standing alone, satisfy the predominant-public-purpose requirement here. To start, the Gift Clauses do not contain an implicit carveout for assisting the poor. After all, article III, section 51-a(a) explicitly specifies classes of "needy" who may receive "grants."

*See* Tex. Const. art. III, § 51-a(a). To say that a municipality can provide such grants to *other* classes in the name of helping the needy would impermissibly render that provision surplusage. *See Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000). Rather, the program's predominant purpose seems to be to give away "use-it-or-lose-it" money the County has lying around. *See* 42 U.S.C. § 803(c)(6)(D).

The County's other expressed aims do not serve a public purpose, either. Purposes like "boost[ing] self-sufficiency" create benefits to individuals, not the public. To be a public purpose, the purpose cannot merely benefit individuals; rather it must also be "directly connected with the local government." *Davis v. City of Taylor*, 67 S.W.2d 1033, 1034 (Tex. 1934) (quoting McQuillin on Municipal Corporations (2d ed.) vol. 6, p. 292, § 2532). Any benefits to the County from achieving these nebulous goals in individual cases are merely "incidental," "indirect[]," and "indefinite." Tex. Att'y Gen. Op. No. JM-1255 at 9 (1990).

"[R]educ[ing] unemployment" and "improving health and educational outcomes" *might* constitute public purposes, but they are demonstrably not the *Program's* purposes. After all, nothing ties the Program's eligibility requirements to employment, health issues (such as healthcare debts), or education (such as demonstrated desire to improve one's education). *See Tex. Mun. League*, 74 S.W.3d

at 384 (requiring a nexus between controls and the asserted public purpose). Instead, recipients were chosen based on some combination of financial status, zip code, prior receipt of public benefits, and good, old-fashioned luck. *Supra* p. 2.

### 3. Harris County does not retain constitutionally sufficient control over the funds.

Neither the County nor its public-health department retains control over disbursed funds "to ensure that the public purpose is accomplished and to protect the public's investment." *Tex. Mun. League*, 74 S.W.3d at 384. To satisfy the Constitution, such controls must be "specifically tailored" to link the expenditures and the predominantly public purpose they purport to serve. Tex. Att'y Gen. Op. No. MW-89, at 2 (1979); *Tex. Mun. League*, 74. S.W.3d at 384; *Byrd v. City of Dallas*, 6 S.W.2d 738, 740 (Tex. [Comm'n Op.] 1928). But none of the Program's alleged controls are specifically tailored, Tex. Att'y Gen. Op. No. MW-89, at 2, to "ensure" that the program accomplishes *any* of its stated purposes, *Tex. Mun. League*, 74 S.W.3d at 384; *see* County Resp. 45 (listing those purposes).

The Uplift Harris iteration of the Program had problems with controls—indeed, the Texas Supreme Court ruled against it on that basis. Specifically, that Court held that Uplift Harris was a "'no strings attached' stipend to those lucky enough to win its lottery.' *In re State*, 2024 WL 2983176, at *4. That was so because

40

"there will be no monitoring of the recipients' day-to-day purchases, so it is unlikely the County will know how recipients spend the money and whether any legitimate public purpose was achieved thereby." *Id*. Though the application for Uplift Harris placed restrictions on the use of the funds, there was "no indication that the County intend[ed] to, or even could, meaningfully enforce those restrictions or truly monitor the recipients' expenditures." *Id*.

The new Program is insufficient for many of the same reasons. The only material changes for controls purposes that the County has made since Uplift Harris are minor. While the County limits where funds recipients may shop via MCCs, it is unable to see what the recipients purchase at an acceptable store. A recipient presumably could not use his or her Program debit card at, say, a liquor store—but the Program would apparently not prevent the recipient from purchasing alcohol at a grocery store like HEB, CVS, or Walmart. 2.RR.19:22-25, 55:22-24. Indeed, County officials have admitted that they will remain completely unaware of what may be purchased with the funds as long as the purchases are made at a vendor with an approved merchant category code. 2.RR.55:22-24. Rather, Harris County will only know *where* items were purchased based on a merchant's MCC. 2.RR.55:25-56:7.

The County maintains that it "referred to constitutionally sound programs such as TANF and SNAP" when considering acceptable MCCs. County Resp. 55. But Maddox explained how TANF and SNAP differ from this Program. The former two programs "have detailed systems that assign certain SKU[3] numbers at the transaction level." 2.RR.54:25-55:3. This means that controls inherent in TANF and SNAP can actually prohibit participants in those programs from making prohibited purchases at the cash register. *Id.* MCCs cannot. 2.RR.55:7-11 (explaining the SKU process is not feasible for the Program) Indeed, County officials have admitted that they will remain completely unaware of what may be purchased with the funds so long as a participant makes the purchase at a vendor with an approved MCC. 2.RR.55:22-24. That "item-level control 'just isn't feasible for this type of program,'" County Resp. 57 (quoting County Resp. App. 2 at 55), shows that the Program is not like TANF or SNAP at all—it is a new animal that lacks sufficient control *by its nature* and *a fortiori* violates the Gift Clauses. And asking recipients "to comply with [Program] requirements," County Resp. 55, is much different than actually enforcing, or at least having the ability to enforce, the County's

_____

[3] SKU means stock-keeping unit which allows vendors to track inventory and consists of alphanumeric digits and a scannable bar code printed on the product label allowing the tracking of price, product details, manufacturer and point of sale.

requirements. "The Gift Clause[s] must be obeyed in reality, not just form." *Borgelt,* 692 S.W.3d at 310.

As with Uplift Harris, "it is unlikely the County will know how [Program] recipients spend the money and whether any legitimate public purpose was achieved thereby." *In re State*, 2024 WL 2983176, at *4. The County avers that Program participants "contractually agree they may only use the funds for 'basic needs.'" County Resp. 9; *see also* County Resp. 54. But when asked how the County would know if someone was violating the Program's terms, Maddox explained that "there's still more planning to do in terms of identifying the specific mechanisms in which somebody is removed from the program." 2.RR.81:21-82:5. In other words, the County doesn't know. It must rely on "what we're going to hear from the friends, family of the participants." 2.RR.83:12-16. A "binding promise," County Resp. 9, without a mechanism for ascertaining whether participants adhere to that promise does not count as constitutionally sufficient control. For the same reasons, the County's insistence that it retains control because it purports to be able to remove a participant from the Program for "any violations of the Program's restrictions" is toothless. *See* County Resp. 57.

Other alleged controls that the County touts are similarly unavailing. While the County contends that it has the "authority to audit" participants' purchases,"

County Resp. 55; *see also* County Resp. 10, it has not even determined its audit procedure, 2.RR.65:21-66:25, 68:1-2. Mere ability to audit, without procedures in place to catch purchases that violate the Program's terms, does not provide evidence of control over the funds. *See* County Resp. 56 ("Harris County will further enhance the audit process as the program is finalized."). The County also contends that it "exercises control on the front end" by "restrict[ing] who may participate to ensure it is effective at achieving its stated goals." County Resp. 56. Eligibility criteria simply limit *who* will receive the County's largesse. Once the funds are in the recipients' hands, Harris County remains unable to identify any specific plan or procedure indicating it would have any further control over the funds.

Harris County seems to believe (at 56) that releasing "funds to GiveDirectly in $5 million increments" indicates "control." But that's not what the incremental release of funds is for. When questioned why the County chose to release five months' worth of payments at a time, Maddox explained, "[I]t takes time to get payments into the hands of the providers . . . [a]nd in this case it's really a unique program where nothing is really being received, but we're expecting somebody to administer those funds on our behalf." 2.RR.52:1-7. This hardly meets the control requirements the Supreme Court envisioned.

The only other limit on the funds is HCPH's admonishment that recipients may not use the money to harm others, to engage in criminal activity, or support terrorism. 4.RR.70. But such limits are hardly "specifically tailored" to the Program's purpose: After all, the Program is a welfare program, not an anti-harm, anti-crime, or anti-terrorism program. It is also unclear how the County intends to enforce its limits. In Uplift Harris, the County said that funds should not be used for "terrorism, fraud, or other nefarious activities," but the Court had "no indication that the County intends to, or even could, meaningfully enforce these restrictions or truly monitor the recipients' expenditures." *In re State*, 2024 WL 2983176, at *4. Nothing has materially changed.

Whether a government complies with the Constitution is not a policy decision. *Contra* County Resp. 57. Because the County remains unable to monitor purchases under the Program, 2.RR.55:22-24, "it is unlikely the County will know how recipients spend the money and whether any legitimate public purpose was achieved thereby," *In re State,* 2024 WL 2983176, at *4. Unlike TANF and SNAP, the Program remains unable to guarantee funds are "only [] directed to their intended purpose." *Id.* Accordingly, Harris County remains unable to provide any "precedent indicating that a government in Texas may make such payments without running afoul of our Constitution's restrictions." *Id.*

#### 4. No other constitutional provision authorizes the Program.

Authority for welfare programs can derive from one of two places. A program can either satisfy the Gift Clauses —which, as the State has just explained, the Program does not—or by an express constitutional authorization. *See, e.g.*, Tex. Const. art. III, § 51-a. No constitutional provision authorizes programs like this one. Article III, section 51 bars "payment of State money to private persons other than those contemplated by" the Constitution's "several amendments" to that rule. Tex. Att'y Gen. Op. No. GM-2578, at 3 (1940); *see* Tex. Const. art. III, § 51. "[E]xpress provision[s]" that "prescrib[e] the manner in which the indigent of this State shall be cared for[] preclude[] . . . resort to any other method short of a constitutional amendment." Tex. Att'y Gen. Op. No. GM-2578, at 3. That is, when the People of Texas want to provide an exception to section 51's general prohibition—applicable to both state and local-government action, Braden, *supra*, at 259—they know how, Tex. Att'y Gen. Op. No. GM-2578, at 4 (discussing former article XVI, section 8). They have provided no such exception that would apply to the Program.

**a.** The Program does not fit within the Constitution's limited welfare exception. Article III, section 51-a permits the Legislature to provide "for assistance grants to [the] needy" but limits eligible categories to "dependent children and the[ir] caretakers," those "totally and permanently disabled because of a mental or

physical handicap," the "aged," and the "blind." Tex. Const. art. III, § 51-a(a). In addition, the Legislature may provide "for medical care, rehabilitation and other similar services for needy persons" and "prescribe such other eligibility requirements for participation in these programs." *Id.* art. III, § 51-a(b). But because other Texans fund such programs, those authorizations are limited. For example, "[t]he maximum amount paid out of state funds for assistance grants, to or on behalf of needy dependent children and their caretakers shall not exceed one percent of the state budget." *Id.* § 51-a(b). And the Legislature is prohibited from "mak[ing] any grant or authoriz[ing] the making of any grant of public moneys to any individual" outside the specified groups. *Id.* art. III, § 51. Tellingly, an earlier version of that provision made an exception to the general rule for "soldiers and sailors of the Confederacy, their wives and widows, and women who aided in the Confederacy." *Linden*, 220 S.W. at 762. To give meaning to that former exception, the Texas Supreme Court determined that the Gift Clauses' "evident purpose is to deny to the Legislature any power to grant or to authorize the grant of public money to all others" beyond those expressly within the Constitution "absolutely." *Id.*

The Program transgresses those constitutional boundaries by extending eligibility beyond the categories specified in article III, section 51-a(a) to everyone under 200% of the federal poverty line living in certain geographic areas or

participating in a certain program. CR.87-88, 5.RR.99. To approve the Program would effectively require the Court to read a broad, all-purpose welfare exception into the text of the Gift Clauses. That is not only counter to precedent and constitutional text—it would also violate the "elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative." *See Spence v. Fenchler*, 180 S.W. 597, 601 (Tex. 1915). After all, if a locality could grant public funds to any group it deemed worthy, the detailed requirements of article III, section 51-a and any similar constitutional exceptions would be entirely superfluous. *See Spence*, 180 S.W. at 601.

Nor does article III, section 51-a(c) permit the Program. That section only applies to "federal matching money" programs. *Id.* Although funded with federal dollars, the Program is far from a federal matching program like Medicaid, which ensures that States and localities do not artificially inflate federal matching funds by imposing the very types of controls that the Program lacks. *Compare supra* p. 40, *with Texas v. Brooks-LaSure*, 680 F. Supp. 3d 791, 801 (E.D. Tex. 2023). Even if the Program's use of federal funds could be deemed "federal matching money," it still would not fall within this exception because the Legislature has not "enact[ed] such

laws as may be necessary" to ensure "federal matching money will be available" for the Program. Tex. Const. art. III, § 51-a(c).

The County attempts to avoid these limitations by contending that article III, section 51 does not apply to its actions because it "limits *State* spending, not counties.'" County Resp. 58. That's wrong. Courts (including the Texas Supreme Court) and commentators alike have recognized that "[s]ection 51 covers both 'grants' and 'loans' as such, whether the government involved is the state or a local unit." Braden, *supra*, at 259; *see, e.g.*, *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 834-35 (applying article III, section 51 to local-government action); *Byrd*, 6 S.W.3d at 739-41 (same).

**b.** The County has contended that section 52-a's "notwithstanding clause" exempts any economic-development program under that section from constitutional strictures. County Resp. 58. But the Supreme Court has already expressed skepticism about that position. *In re State*, 2024 WL 2983176, at *4. Under such a "permissive reading," the Court said, "nearly any direct gift of public money that will likely be spent by the recipient could qualify as 'economic development'—on the theory that any boost in overall consumer spending is good for the economy." *Id.* As the Court recognized, reading section 52-a that broadly would "come[] close to repealing the Gift Clauses' ban on 'gratuitous payments to individuals.'" *Id.*

(quoting *Tex. Mun. League*, 74 S.W.3d at 383). Texas courts do not, however, lightly treat constitutional text as surplusage. *See, e.g.*, *Spradlin*, 34 S.W.3d at 580. Thus, the Supreme Court posited, the better view is that "by authorizing 'grants of public money . . . for the public purposes of development and diversification of the economy of the state,'" section 52-a was "designed to clarify that 'development and diversification of the economy of the state' qualify as 'public purposes.'" *In re State*, 2024 WL 2983176, at *4 (quoting Tex. Const. art. III, § 52-a).

True, the Court did not conclusively "resolv[e]" this issue. *Id.* But its analysis tracks constitutional history as well as text. As with any constitutional provision, courts "consider the history as well as the text in order to understand the constitution's original meaning." *Hogan v. S. Methodist Univ.*, 688 S.W.3d 852, 857 (Tex. 2024). When section 52-a was passed in 1987, *Linden* (then the lead case on the Gift Clauses' meaning) required any public expenditure to have a "strictly governmental purpose[]" to survive Gift Clause scrutiny. 220 S.W. at 762. This requirement led to concern that the Gift Clauses would prevent Texans from enjoying "the general benefits resulting from the operation of a private industry." Tex. Att'y Gen. Op. No. H-357 (1974). The Legislature proposed, and the people ratified, section 52-a to confirm that the benefits that flow from private industry fulfill a public purpose, *see id.*—not to provide a wholesale end run around the Gift

50

Clauses, *see* Tex. Const. art. III, § 52-a (providing that the Legislature may "provide for the creation of programs and the making of loans and grants of public money . . . for the *public purposes* of development and diversification of the economy of the state" (emphasis added)); *see also In re State*, 2024 WL 2983176, at \*4.

Even if section 52-a does provide some sort of exception to the Gift Clauses' strictures, Uplift Harris is not an "economic development" program within that section's meaning. "[W]ords grouped in a list should be given related meanings," and the appropriate meaning is the "most general quality" common to the listed terms that is "relevant to the context, or the least common denominator, so to speak." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195-96 (2012); *see also U.S. Fid. & Guar. Co. v. Goudeau*, 272 S.W.3d 603, 606 (Tex. 2008). Here, the phrase "development . . . of the economy of the state" is linked with "elimination of unemployment or underemployment in the state," "stimulation of agricultural innovation," and "development or expansion of transportation or commerce." Tex. Const. art. III, § 52-a. These phrases unambiguously reference grants in service of specific economic-development programs: Grants *for* new businesses to start, grants *for* research and development, and grants *for* employees' skills training all fit the bill. Guaranteed-income programs,

which by their nature give money *for* no specific economic-development program, differ in kind.

**c.**     Finally, the County argues its "legal duty to support those residents it—and it alone—determines are paupers or indigent" renders the Gift Clause analysis inapplicable. CR.95. *Linden* acknowledges that counties "are made use of by the State for the collection of taxes, for the diffusion of education, for the construction and maintenance of public highways, and for the care of the poor." 220 S.W. at 763. In that case, the Court was simply distinguishing between cities, which are created for the "convenience of the locality," and counties, which "are essentially instrumentalities of the State," for the purpose of determining whether the State's bestowing funds on a county violated the Gift Clauses. *Linden*, 220 S.W. at 762 (quoting *Hamilton Cnty. Bd. of Cmm'rs v. Mighels*, 7 Ohio St. 109, 119 (1857)). Nowhere did the Court indicate that counties can make gifts that the State may not. *See id.* Just the opposite: Because the State may not make gratuitous gifts for private or individual purposes because no constitutional exception applies, neither can Harris County as an arm of the State. *See id.*; *Childress County v. State*, 92 S.W.2d 1011, 1015 (Tex. 1936); *see supra* pp. 33-35.

## B. The Program violates the Texas Equal Protection Clause.

The Program's Gift Clause violation is particularly concerning because it also provides a "set of men"—namely, those randomly selected in a lottery—with an "exclusive separate public emolument[]" in direct violation of Texas's equal-protection guarantee. Tex. Const. art. I, § 3. It is generally accepted that this guarantee precludes classifications that are "arbitrary or unreasonable," requiring instead that there be "a real and substantial difference having a relation to the subject of the particular enactment." *Crawford Chevrolet, Inc. v. McLarty*, 519 S.W.2d 656, 661 (Tex. App.—Amarillo 1975, no writ); *see City of Brookside Village. v. Comeau*, 633 S.W.2d 790, 795-96 (Tex. 1982). A classification is invalid if "it appears that the basis therefor is purely arbitrary," *Inman v. R.R. Comm'n*, 478 S.W.2d 124, 127 (Tex. App.—Austin 1972, writ ref'd n.r.e.), or that the basis has no rational connection to the putative justification for the law, *see Whitworth v. Bynum*, 699 S.W.2d 194, 195 (Tex. 1985). The Program violates this equal-protection guarantee because, for many of the reasons already discussed, there is no rational connection among the source of the funds, the eligibility criteria, and the program's putative purpose. *E.g.*, *supra* p. 39.

Harris County has attempted to justify this program partly by insisting that it is paid for entirely by federal funds, CR.85, that the County received "to respond to

53

the COVID-19 public health emergency and its economic impacts," *Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. 26786, 26787 (May 17, 2021). But Texas's Equal Protection Clause has no federal-funding exception. To the contrary, unlike the Gift Clauses—which serve as a structural limit on legislative-type bodies—the Equal Protection Clause, like the Due Course of Law Clause, is in the Texas Constitution's Bill of Rights and serves to ensure fairness to all Texans. Although such principles can arise in the same case and even overlap, they should not be confused because they serve different purposes in our constitutional system. *Cf.* Alexander Volokh, *The New Private-Regulation Skepticism: Due Process, Non-delegation and Antitrust Challenges*, 37 Harv. J. L. & Pub. Pol'y 931 (2014). Moreover, there is no real connection between the eligibility criteria and COVID. *See* 2.RR.45:14-50:1. (describing the eligibility criteria).

The County fares little better in comparing the distribution to Harris County's own self-described goals. Again, if the program's purpose were truly to "reduce poverty . . . and improve general health," 2.RR.10:11-19, one would expect the classifications to focus on the poorest and sickest, *supra* p. 5. But who receives Program payouts does not depend on any health-related criteria. 2.RR.10:20-11:4. And the wealth-based criteria are drawn so broadly that the County had to choose randomly who receives the windfall.

The randomness of the beneficiaries and the *sui generis* nature of the payments underscore why Harris County cannot justify these payouts as some form of pilot program. For example, when Texas transitioned between different models of Medicaid funding, it began that transition with specific classes with unique characteristics. *Waiver Overview and Background Resources*, HHSC, https://tinyurl.com/1115WaiverOverview (last visited December 12, 2024). And generally, when government entities have used random selection, no "exclusive separate public emolument[]" has been at issue, Tex. Const. art. I, § 3, because the question is typically *how* a public benefit will be provided—not *if*.[4] Here, by contrast, the Program hands a series of one-time payments to some people, but not others, from within the class it defined. The random selection in the distribution of those payments is a violation of the State's equal-protection guarantee.

It is no response that "[t]he classification at issue in the Community Prosperity Program is poverty—not random selection" and that "[t]he principal criteri[on] for selection is income level." CR.107. That might be true if the Program were to provide $500 to every individual who meets the income level the program has set, or even to the first 2,000 people who apply on the theory that those in the

---

[4] For example, though lottery selection has been used to effectuate school choice, no one in that circumstance was denied a public education. *School Choice*, Houston ISD, https://tinyurl.com/bdhu675x (last visited December 12, 2024).

greatest need will have the greatest incentive to apply early. But it doesn't. 2.RR.10:20-11:7. The Program also requires those individuals to live in certain zip codes or participate in ACCESS Harris County. *Id*. Defendants have not defended this basis for allocating program benefits, with good reason: Poor individuals who live within the right zip code or participate in ACCESS Harris County are not rationally distinguished from poor individuals who do not. But even if they were, *still* not every one of the 55,000 eligible applicants receives the payment. CR.88. The number is instead reduced to 1,850—or 3.36% of the eligible class—by random selection. And welfare by lottery is the opposite of what the Constitution guarantees.

## VI. The State Has Established Irreparable Harm.

Finally, the State met its burden to show a probable, imminent, and irreparable injury from these twin constitutional violations. *Butnaru*, 84 S.W.3d at 204. Ongoing violations of law harm the State. *See Hollins*, 620 S.W.3d at 410. And the denial of the temporary injunction upended, rather than preserved, the status quo.

### A. The State is harmed in its capacity as a sovereign.

As a sovereign entity, the State has an "intrinsic right to enact, interpret, and enforce its own laws." *State v. Naylor*, 466 S.W.3d 783, 790 (citing *Printz v. United States*, 521 U.S. 898, 912 n.5 (1997)). Indeed, the theory behind an *ultra vires* lawsuit

56

is that it "reassert[s] the control of the [S]tate" and "enforce[s] existing policy." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

To the extent there had previously been any doubt (and there was not[5]), *Hollins* expressly held that the State's "justiciable interest in its sovereign capacity in the maintenance and operation of its municipal corporations in accordance with law" supported not just standing but also a preliminary injunction. *Hollins*, 620 S.W.3d at 410. In reaching that conclusion, the Texas Supreme Court emphasized that the sovereign "would be impotent to 'enforce its own laws' if it could not temporarily enjoin those breaking them pending trial." *Id.* Thus, "[w]hen the State files suit to enjoin *ultra vires* action by a local official, a showing of likely success on the merits is sufficient to satisfy the irreparable-injury requirement for a temporary injunction." *Id.* That is because *ultra vires* conduct harms the sovereign as a matter of law. *Id.* For the reasons explained above, the State made that showing.

This principle exists not "for the benefit of the State[] as [a] political entit[y], or even for the benefit of the public officials governing the State[]." *New York v. United States*, 505 U.S. 144, 181 (1992). The "ultimate purpose" of the structural

---

[5] *See Abbott v. Perez*, 585 U.S. 579, 602-03 (2018); *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (per curiam); *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019); *accord Tex. Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 441 (Tex. App.—Austin 2018, pet. denied).

provisions of the Constitution "is to protect the liberty and security of the governed." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991); *see also, e.g.*, *Maryland v. King*, 567 U.S. 1301, 13033 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers))); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 742 (S.D. Miss. 2014) (mem. op.) ("The State . . . has a significant interest in enforcing its enacted laws."). That is, the State has a protectable interest in the applicability of its laws so that it may stand as a "guardian and protector of all public rights." *Yett*, 281 S.W. at 842.

## B. The interest in preserving the status quo, balance of equities, and public interest favor the State.

For related reasons, the "balance [of] equities," *In re Gamble*, 71 S.W.3d 313, 317 (Tex. 2002), heavily favors the State. "Because the State is the appealing party, its interest and harm merge with that of the public," *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017); *see also, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—even when the dispute is between the State and one of its subdivisions, *cf.* Order at 1, *In re Abbott*, No. 21-0720 (Tex. Aug. 26, 2021).

Here, the equities favored the State, whose position represented the status quo. The status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy." *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 556 (Tex. 2016) (quoting *Janus Films, Inc. v. City of Fort Worth*, 358 S.W.2d 589-590 (1962)). Here, that status is that the COVID funds received from the federal government remain in the hands of Harris County and its agents, not thousands of individual recipients who likely cannot or will not repay them should the payments be held unlawful. If Harris County were allowed to disburse handouts to random residents, it is virtually certain that such funds can never be recovered; this would alter the status quo forever. The State brought its application for temporary injunction to maintain that status quo. CR.28. The Texas Supreme Court has repeatedly held that temporary relief is appropriate under such circumstances. Order at 1, *In re Abbott*, No. 21-0720 (Tex. Aug. 26, 2021); *Butnaru*, 84 S.W.3d at 204.

## PRAYER

The Court should reverse the trial court's orders and render a temporary injunction prohibiting Defendants from issuing payments under Community Prosperity pending final trial on the merits.

59

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

WILLIAM WASSDORF
Deputy Chief

BRENT WEBSTER
First Assistant Attorney General

/s/ William H. Farrell
WILLIAM H. FARRELL
Assistant Attorney General
State Bar No. 00796531
Tel: (512) 936-2650
biff.farrell@oag.texas.gov

RALPH MOLINA
Deputy First Assistant
Attorney General

JAMES LLOYD
Deputy Attorney General
for Civil Litigation

Office of the Attorney General
General Litigation Division
P.O. Box 12548 (MC-019)
Austin, Texas 78711-2548
Tel.: (512) 936-2650
Fax: (512) 320-0667

KIMBERLY GDULA
Chief

Counsel for Appellant

## CERTIFICATE OF COMPLIANCE

Microsoft Word reports that this brief contains 13,410 words, excluding exempted text.

/s/ William H. Farrell
WILLIAM H. FARRELL

## APPELLANT'S APPENDIX

| | | |
|---|---|---|
| Amended Final Judgment | Tab A | App'x 1 |
| Tex. Const. art. III, § 51 | Tab B | App'x 2 |
| Tex. Const. art. III, § 52(a) | Tab C | App'x 3 |

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

THE STATE OF TEXAS,

*Appellant,*

*v.*

HARRIS COUNTY, TEXAS; HARRIS COUNTY COMMISSIONERS COURT; LINA HIDALGO, IN HER OFFICIAL CAPACITY AS HARRIS COUNTY JUDGE; RODNEY ELLIS, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 1; ADRIAN GARCIA, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 2; TOM RAMSEY, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 3; LESLEY BRIONES, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 4; HARRIS COUNTY PUBLIC HEALTH; AND LEAH BARTON, IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF HARRIS COUNTY PUBLIC HEALTH,

*Appellees.*

On Appeal from the
165th Judicial District Court, Harris County

## BRIEF FOR APPELLANT

# TAB A
Appendix 1

Amended Final Judgment dated November 25, 2024

For Official Governmental Use Only - Do Not Disseminate to the Public: 117698961 - Page 1 of 2

FILED
Marilyn Burgess
District Clerk

NOV 25 2024
Time: 9:50 am
Harris County, Texas
By _M. Singleton_
Deputy

**CAUSE NO. 2024-63919**

| | | |
|---|---|---|
| STATE OF TEXAS, *Plaintiff,* | § § § § | IN THE DISTRICT COURT |
| v. | § § | |
| HARRIS COUNTY, TEXAS, HARRIS COUNTY COMMISSIONER COURT, LINA HIDALGO, in her official capacity as Harris County Judge, RODNEY ELLIS, in his official capacity as Commissioner of Harris County Precinct 1, ADRIAN GARCIA, in his official capacity as Commissioner of Harris County Precinct 2, TOM RAMSEY, in his official capacity as Commissioner of Harris County Precinct 3, and LESLEY BRIONES, in her official Capacity as Commissioner of Harris County Precinct 4, HARRIS COUNTY PUBLIC HEALTH, BARBIE ROBINSON, in her official capacity as Executive Director of Harris County Public Health, *Defendants.* | § § § § § § § § § § § § § § § § § § § | 165th JUDICIAL DISTRICT HARRIS COUNTY, TEXAS |

*P-2*
*Epo*
*Pjurx*
*Modfx*

## AMENDED FINAL JUDGMENT

The Court replaces its Order granting the Harris County Defendants' plea to the jurisdiction, signed on October 24, 2024, with this Amended Final Judgment.

On October 24, 2024, the Court considered Harris County Defendants' Plea to the Jurisdiction filed in the above-styled and numbered cause. After having considered the pleadings, all documents on file with the Court, testimony of witnesses, exhibits, and arguments of counsel, the Court **GRANTS** the Harris County Defendants' Plea to the Jurisdiction.

On November 22, 2024, the Court considered the Harris County Defendants' Sworn Motion to Show Authority Under Rule 12 (the "Motion"). After having considered the motion, response, any replies, and arguments of counsel, the Court **GRANTS** the Motion.

**App'x 1**

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that the Court refuses to permit the Attorney General and attorneys working for his office from appearing on behalf of the State of Texas in this Court in this case. Unless a person who is authorized to prosecute this case on behalf of the State appears by November 25, 2024, it is further ORDERED that all pleadings filed in this action by the Attorney General purportedly on behalf of the State are stricken.

IT IS THEREFORE FURTHER ORDERED, ADJUGED, and DECREED that Harris County Defendants' Plea to the Jurisdiction is GRANTED and all parties and all claims are dismissed for lack of jurisdiction. All costs shall be borne by the party incurring them.

This Order is Final and Appealable.

SIGNED this ____23rd____ day of November, 2024  at 8:06 p.m.

_____
JUDGE PRESIDING

App'x 1

For Official Governmental Use Only - Do Not Disseminate to the Public: 117698961 - Page 2 of 2



I, Marilyn Burgess, District Clerk of Harris County, Texas certify that this is a true and correct copy of the original record filed and or recorded in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this   December 2, 2024

Certified Document Number:        117698961 Total Pages:  2

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

**App'x 1**

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

THE STATE OF TEXAS,

*Appellant,*

*v.*

HARRIS COUNTY, TEXAS; HARRIS COUNTY COMMISSIONERS COURT; LINA HIDALGO, IN HER OFFICIAL CAPACITY AS HARRIS COUNTY JUDGE; RODNEY ELLIS, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 1; ADRIAN GARCIA, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 2; TOM RAMSEY, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 3; LESLEY BRIONES, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 4; HARRIS COUNTY PUBLIC HEALTH; AND LEAH BARTON, IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF HARRIS COUNTY PUBLIC HEALTH,

*Appellees.*

On Appeal from the
165th Judicial District Court, Harris County

**BRIEF FOR APPELLANT**

# TAB B
Appendix 2

TX CONST Art. 3, § 51
§ 51. Grants of public money prohibited

Vernon's Texas Statutes and Codes Annotated
  Constitution of the State of Texas 1876 (Refs & Annos)
    Article III. Legislative Department
      Requirements and Limitations

Vernon's Ann.Texas Const. Art. 3, § 51

§ 51. Grants of public money prohibited

Currentness

The Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever; provided that the provisions of this Section shall not be construed so as to prevent the grant of aid in cases of public calamity.

**Credits**

Adopted Feb. 15, 1876. Amended Nov. 6, 1894; Nov. 1, 1898; Nov. 8, 1904; Nov. 8, 1910; Nov. 5, 1912; Nov. 4, 1924; Nov. 6, 1928; Nov. 5, 1968; Nov. 2, 1999.

**Editors' Notes**

**INTERPRETIVE COMMENTARY**

**2007 Main Volume**

Section 51, in its original form as placed in the Constitution of 1876, was a prohibition placed upon the legislature that it should not grant or authorize the grant of public money to any individual, association or corporation save in cases of public calamity. This prohibition is retained in the present section as amended.

This provision again demonstrates the vigilance of the framers of the 1876 Constitution for the protection of the public funds in an era following the reconstruction period which was marked by profligacy.

The giving or granting away of public money, its application to other than strictly governmental purposes, is what this section is intended to guard against. It does not prevent the granting of state funds to municipal and political corporations where the money is granted to be used for a governmental purpose. See Aransas Pass v. Keeling, 112 T. 339, 247 S.W. 818 (1923).

The first citizens to whom public money of the state was granted were indigent and disabled Confederate soldiers and sailors and their widows. Confederate veterans were not entitled to federal pensions. Since Section 51 forbad the grant of public money to any individual, an amendment was necessary to make such aid possible. This was done in 1924.

The first amendment provided, among other things, that indigent widows of Confederate soldiers and sailors could receive aid if bona fide residents of the state since January 1, 1910 and who were married to such soldiers and sailors prior to January 1, 1910. Moreover and in any event, the word "widow" as used in the amendment did not include women born since the year 1861.

App′x 2

Section 51 was again amended in 1928, and these requirements of residence since and marriage prior to January 1, 1910 were no longer included. Also dropped was that definition of widows requiring them to be born in or prior to the year 1861. This, of course, had an effect of permitting more widows of Confederate soldiers and sailors to qualify for aid.

The money to pay these pensions was raised by the levying of a tax not to exceed seven cents on each one hundred dollars valuation of property. This was later reduced to two cents. See comment on Article VII, Section 17.

Notes of Decisions (162)

Vernon's Ann. Texas Const. Art. 3, § 51, TX CONST Art. 3, § 51
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

End of Document        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

App′x 2

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

### THE STATE OF TEXAS,

*Appellant*,

*v.*

### HARRIS COUNTY, TEXAS; HARRIS COUNTY COMMISSIONERS COURT; LINA HIDALGO, IN HER OFFICIAL CAPACITY AS HARRIS COUNTY JUDGE; RODNEY ELLIS, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 1; ADRIAN GARCIA, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 2; TOM RAMSEY, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 3; LESLEY BRIONES, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 4; HARRIS COUNTY PUBLIC HEALTH; AND LEAH BARTON, IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF HARRIS COUNTY PUBLIC HEALTH,

*Appellees.*

On Appeal from the
165th Judicial District Court, Harris County

## BRIEF FOR APPELLANT

# TAB C
## Appendix 3

TX CONST Art. 3, § 52
§ 52. Restrictions on lending credit or making grants by political
corporations or political subdivisions; authorized bonds; investment of funds

Vernon's Texas Statutes and Codes Annotated
  Constitution of the State of Texas 1876 (Refs & Annos)
    Article III. Legislative Department
      Requirements and Limitations

Vernon's Ann.Texas Const. Art. 3, § 52

§ 52. Restrictions on lending credit or making grants by political
corporations or political subdivisions; authorized bonds; investment of funds

Currentness

(a) Except as otherwise provided by this section, the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever, or to become a stockholder in such corporation, association or company. However, this section does not prohibit the use of public funds or credit for the payment of premiums on nonassessable property and casualty, life, health, or accident insurance policies and annuity contracts issued by a mutual insurance company authorized to do business in this State.

(b) Under Legislative provision, any county, political subdivision of a county, number of adjoining counties, political subdivision of the State, or defined district now or hereafter to be described and defined within the State of Texas, and which may or may not include, towns, villages or municipal corporations, upon a vote of two-thirds majority of the voting qualified voters of such district or territory to be affected thereby, may issue bonds or otherwise lend its credit in any amount not to exceed one-fourth of the assessed valuation of the real property of such district or territory, except that the total bonded indebtedness of any city or town shall never exceed the limits imposed by other provisions of this Constitution, and levy and collect taxes to pay the interest thereon and provide a sinking fund for the redemption thereof, as the Legislature may authorize, and in such manner as it may authorize the same, for the following purposes to wit:

(1) The improvement of rivers, creeks, and streams to prevent overflows, and to permit of navigation thereof, or irrigation thereof, or in aid of such purposes.

(2) The construction and maintenance of pools, lakes, reservoirs, dams, canals and waterways for the purposes of irrigation, drainage or navigation, or in aid thereof.

(3) The construction, maintenance and operation of macadamized, graveled or paved roads and turnpikes, or in aid thereof.

(c) Notwithstanding the provisions of Subsection (b) of this Section, bonds may be issued by any county in an amount not to exceed one-fourth of the assessed valuation of the real property in the county, for the construction, maintenance, and operation of macadamized, graveled, or paved roads and turnpikes, or in aid thereof, upon a vote of a majority of the voting qualified voters of the county, and without the necessity of further or amendatory legislation. The county may levy and collect taxes to pay the interest on the bonds as it becomes due and to provide a sinking fund for redemption of the bonds.

App'x 3

(d) Any defined district created under this section that is authorized to issue bonds or otherwise lend its credit for the purposes stated in Subdivisions (1) and (2) of Subsection (b) of this section may engage in fire-fighting activities and may issue bonds or otherwise lend its credit for fire-fighting purposes as provided by law and this constitution.

(e) A county, city, town, or other political corporation or subdivision of the state may invest its funds as authorized by law.

**Credits**

Adopted Feb. 15, 1876. Amended Nov. 8, 1904, proclamation Dec. 29, 1904; Nov. 3, 1970; Nov. 7, 1978; Nov. 4, 1986; Nov. 7, 1989; Nov. 2, 1999.

**Editors' Notes**

**INTERPRETIVE COMMENTARY**

**2007 Main Volume**

In the early days of Texas, private capital for large scale investments was scarce. This was due to the predominantly agricultural character of the economy. It was difficult for private enterprise to obtain capital for any large scale undertaking, and consequently the state was called on to aid business enterprise by grants of land or loans of money and credit. The theory underlying these requests for aid was that it was the duty of the state to promote the prosperity of all its members, and that it might use its powers, even to the extent of appropriating money from the treasury, to foster laudable enterprises in which a considerable number of its people were interested.

The greatest benefit from loans and gifts of state money and credit accrued to railroads. The state was seeking more people for her vast domain, a better means of communication between them, and a better exchange of their products. Either the state had to furnish aid to railroads, or else had to organize rail transportation itself. It chose to do the former, and lent a considerable amount of the permanent school fund to railroads prior to and during the Civil War. After the war the railroads were unable to meet their payments, which eventually caused considerable embarrassment to the state, and was responsible for the constitutional prohibition against the loaning of state credit to private enterprise.

But while the legislators were considering how best to provide the transportation facilities needed by the people, the people of various localities requested legislative authorization to issue bonds and levy taxes to pay the interest and create a sinking fund to retire the bonds, the bonds to be donated to railroads to be built through or to them.

Prior to the Civil War, only a few counties and cities in Texas had indulged in this type of railroad aid, but after the war, and following the repeal in 1869 of a law passed in 1854 granting state lands to aid in railroad construction, there were widespread and insistent appeals from counties and cities along projected routes of several important railroads, then building or preparing to do so, for authority to issue bonds to assure the building of roads through their communities. In 1871, the legislature yielded to these appeals and authorized any city or county to hold elections on the question of issuing bonds to be donated to railroads. The railroads made use of this law, by threatening to bypass localities which refused them aid, and thereby secured greater contributions than they would have secured otherwise.

The Democrats, upon regaining control of the state government in 1874, immediately repealed the law, and also incorporated in the constitution this prohibition against the legislature from authorizing any county, city or town to lend its credit or grant public money to any individual association or corporation, or to become a stockholder in such association or corporation.

App′x 3

By 1904, Texans were awakened to the fact that unless extensive water conservation measures were undertaken, the state could not grow in populace or in industry. But the constitution recognized only three entities which could collect taxes and expend public money, namely, the state, counties, and cities and towns, and all of these were so severely limited in the rate of tax they could levy that large scale permanent improvements such as water conservation projects, or a wide-spread road construction program were out of the question.

Therefore Art. 3, Sec. 52 was amended adding to the state's taxing units "districts" which could be established for permanent improvements including conservation projects and road-building projects. These districts could issue bonds in an amount not exceeding 25% of the total assessed value of real property lying within the district, and could levy a tax at a rate sufficient to pay the principal and interest on such bonds.

By 1917, it was recognized that the 1904 amendment was too restrictive in its limitation as to the maximum amount of indebtedness which a district might create in order to accomplish water conservation or major road-building projects. Thus Art. 16, Sec. 59 was added to the constitution, allowing the creation of conservation and reclamation districts as governmental agencies with power to incur such debts as might be necessary. The limitation on indebtedness established by Art. 3, Sec. 52 was thus removed.

After the adoption of the 1917 amendment, the legislature passed the Canales Act (General Laws, 35th Leg., 4th called session--1918--pp. 40-43) which provided that any conservation or reclamation district which had been organized under the authority of Art. 3, Sec. 52 might by a prescribed procedure avail itself of the benefits of the new amendment which removed former limitations on indebtedness.

Notes of Decisions (354)

Vernon's Ann. Texas Const. Art. 3, § 52, TX CONST Art. 3, § 52
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

App′x 3